518 So.2d 749 (1985)
Henry F. HAYS
v.
STATE.
1 Div. 822.
Court of Criminal Appeals of Alabama.
August 20, 1985.
Rehearing Denied October 22, 1985.
*751 M.A. Marsal, Mobile, for appellant.
Charles A. Graddick, Atty. Gen., and Joseph G.L. Marston III, Asst. Atty. Gen., for appellee.
TAYLOR, Judge.
The appellant, Henry F. Hays, was indicted by the Mobile County grand jury on December 5, 1983, for the capital murder of Michael Donald in the course of a robbery, a violation of § 13A-5-31(a)(2), Code of Alabama 1975. He was arraigned that afternoon, and the following day trial commenced. At the conclusion of said trial, the jury found appellant guilty as charged, and after a sentencing proceeding, the jury recommended life without parole. Thereafter, on February 2, 1984, and after having received a presentence report, the trial judge sentenced the appellant to death. The appellant's motion for new trial was thereafter overruled, and this appeal follows.
The trial court's order sentencing the appellant to death contains a fair recitation of the facts as follows:
"The Court finds the facts to be that from the evidence and beyond a reasonable doubt that the defendant and James "Tiger" Knowles, both members of the Ku Klux Klan, on the day of March 20, 1981, went to the home of Hays' brother-in-law, Frank Cox, and secured a rope. Knowles tied the rope into a hangman's noose. Later on in the evening of the same day, the defendant, Knowles and others were playing cards and watching *752 television at the defendant's apartment. During the 10 p.m. news, the defendant and Knowles learned that a Mobile County Circuit Court jury, having heard the case involving the slaying of a white Birmingham police officer by a black man, could not reach a verdict and a mistrial had been declared. The events of this trial and previous trials of this particular case had been discussed by the defendant, Knowles and others at a Klan meeting.
"After the news, the defendant and Knowles left the apartment and drove around looking for a black man to hang. Neither the defendant nor Knowles knew the victim, Michael Donald, and he was abducted by the defendant and Knowles simply because he was a black man who was alone.
"The defendant and Knowles took Michael Donald to a location off Highway 225 in Baldwin County, Alabama, tied a rope around his neck, robbed him and proceeded to choke and beat him until he was unconscious. The defendant, stating that he wanted to make sure the victim was dead, cut Donald's throat three times with a knife. The two then placed Donald's body back into the vehicle and returned to Herndon Avenue in Mobile County, Alabama. Later, the defendant and Knowles took the body across the street on Herndon Avenue and hung it from a tree. The Court finds from the evidence beyond a reasonable doubt that these activities of the defendant and Knowles were performed in conjunction with the burning of a cross on the grounds of the Mobile County Courthouse on the night of March 20, 1981, by other Klan members. The defendant is a leader in the Klan, known as the Exalted Cyclops."
We do, however, think it is necessary to add the following facts. After having obtained the rope that was eventually used to hang the victim, and prior to returning to the apartment, the appellant and Knowles obtained a .22-caliber pistol from another Ku Klux Klansman. After hearing the news of the mistrial, the appellant and Knowles left the apartment "for the purpose to go hang someone." After driving around for approximately 45 minutes, they found what they were looking for, a lone black man walking along the street; Knowles testified "He was by himself so he seemed like a good victim at that time because he was by himself and in a secluded area". The appellant pulled his car over to the curb, and Mr. Knowles leaned out the window and asked Mr. Donald for directions to a certain nightclub. As Mr. Donald approached the car in order to aid the apparently lost drivers, Mr. Knowles pulled out the .22-caliber pistol and forced Mr. Donald into the back seat of the car. Mr. Knowles got into the back seat of the car with Mr. Donald and forced the latter to empty his pockets, including his wallet, which was laid on the floor of the appellant's car. While driving to Baldwin County, the victim stated, according to Knowles, "`Oh, God, I can't believe this is happening. Do anything you want to just ... just let me go.'" Knowles continued: "And the defendant asked him if he had heard about the Atlanta killings at that time.... And Donald said, `Yes.' And he [appellant] said, `You know you could wind up like that.' And then he [Donald] said `Oh, God,' he said, `Please you can do anything you want to to me. Beat me or anything, just don't kill me.'"

I
Initially, the appellant contends that the trial court committed reversible error when it denied his motion for a continuance filed the morning of trial, December 6, 1983. The asserted basis for the need of a continuance was due to the lack of time to prepare for the new indictmentthe one under which the appellant was convictedreturned by the grand jury the day before.
The appellant was originally indicted nearly six months earlier by the Mobile County grand jury, on June 22, 1983. The operative language in that indictment stated that the appellant
"Did intentionally cause the death of Michael Donald by strangling him with a rope. The said HENRY F. HAYS intentionally caused the death of Michael Donald *753 while the said HENRY F. HAYS was abducting or attempting to abduct Michael Donald with the intent to inflict physical injury upon the person of Michael Donald in violation [of] § 13A-5-40(a)(1), Code of Alabama, and against the peace and dignity of the State of Alabama."
The operative language in count two of the same indictment was identical, except that it charged the appellant with the abduction and murder of Michael Donald "with the intent to terrorize Michael Donald."
Trial was scheduled to commence on Monday, December 5, 1983; however, according to the record, on the Friday morning prior to the scheduled trial date, the prosecutor was advised that he "definitely... would be the person trying the case." After obtaining the file, "I took one look at the indictment at that time. That's the first time I had ever read the indictment and I realized the problem."[1] The State also had some evidentiary problems. There were some physical items of evidence out of state in a laboratory still being tested at the request of the State, items which the defense wished to examine prior to trial. Therefore, the State requested a one-day continuance, to which the defense consented.
On the following Monday, December 5, 1983, without the appellant's knowledge, the district attorney convened a grand jury, during which the appellant was re-indicted. The operative language of this new indictment was as follows:
"Did, in the course of committing a theft of one dollar in lawful currency of the United States and a wallet, the property of Michael Donald, use force against the person of Michael Donald, with intent to overcome his physical resistance or physical power of resistance, while the said HENRY F. HAYS or another participant in this theft was armed with a deadly weapon, to-wit: a gun, and did feloniously take said currency and wallet of the approximate aggregate value of two dollars ($2.00), from Michael Donald's person or in his presence, and against his will by violence to his person, or by putting him in such fear as unwillingly to part with the same, and in the course of said robbery, the said HENRY F. HAYS did intentionally cause the death of another person, the said Michael Donald, by strangling him with a rope, in violation of § 13A-5-31(a)(2), of the Code of Alabama, against the peace and dignity of the State of Alabama."
The operative language in count two of this new indictment was identical, except, instead of alleging that the theft occurred with the use of a gun, this second count alleged that the appellant did "at the time cause serious physical injury to the said Michael Donald, to-wit: death." The appellant was arraigned at about four o'clock that afternoon for the new indictment, and the earlier indictment was nol-prossed. The plea was entered under protest:
"THE COURT: To the charge ...
"MR. MARSAL: Your Honor, I do not agree, I do not consent to any arraignment under the charge in this indictment.
"THE COURT: All right. The Court's not asking you to consent to it Mr. Marsal. The Defendant would plead to the charge.
"MR. MARSAL: All right. We will object to the Court ...
"THE COURT: All right. The objection is overruled. The Defendant will plead to the charge or the Court will enter a plea for him; which will it be?
"MR. MARSAL: He enters a plea of not guilty under protest.
"THE COURT: All right. The case is set for trial in the morning.
*754 "MR. MARSAL: Judge, let me please be heard relative to you setting this case for in the morning. The Defendant is not ...
"THE COURT: I'm already setting it for tomorrow and then I will hear you on a motion for continuance. I am going to allow you until the trial date which is presently scheduled for tomorrow to file any demurrers or special pleas to the indictment.
"It is ordered by the Court that all motions filed in the case which was nol-prossed be transferred and become a part of the record of this case.
"Now, you wish a continuance of the case, Mr. Marsal?
"MR. MARSAL: Very diligently, your Honor.
"THE COURT: All right. For what reasons?
"MR. MARSAL: Well, I would like the opportunity to be able to at least have some time at my desk with this indictment in order to frame the vast change of allegations in this indictment compared to the indictment that has been in this Court for the past four months.
"There is no mention of any theft in the original, in the indictment that we have labored with during this time and prepared for trial. Not one word of theft. There's no mention in that indictment of any weapon. Not one word of a weapon. And I submit to the Court, you know, I think I'm being imposed on to have to have to [sic] stand up here unprepared without time to study and give this the necessary attention because of something so important. This young man is charged with a capital offense meaning death by electrocution or life imprisonment without parole. And for us to be called on, it's now 12 minutes after four, I was notified about an hour ago that this indictment had been returned and that I came and made myself available in order to be here at your request, and I submit to the Court that there's no human being and of course, I don't say that I have the ability of the person that has the expertise of being able to thrash out during this time, and I don't think it's proper for the Court to have to pass a decision so important as this ...
"THE COURT: Well, now, let me make the position of the Court perfectly clear. I am going to give you whatever chance you need to review that indictment. I certainly think you can do it before in the morning. And I certainly think you can consider what other evidence you would want to present and how you might be prejudiced if, at all, by going to trial tomorrow and I'll hear you tomorrow morning on it. If you tell meMr. Harrison, I would expect you to get with Mr. Marsal and give him any information you have. But, have the facts changed in any way?
"MR. HARRISON: I ... My case will be exactly the same, Judge. I wouldn't prove anything different. You know, of course of the argument ...
"THE COURT: Is there anything that you would give to Mr. Marsal under the new indictment that you wouldn't have given to him under the old indictment in terms of. . .
"MR. HARRISON: No, sir. Discovery would be the same as far as I know.
". . . .
"MR. MARSAL: Your Honor, in issue to that, why weren't we told back then that a gun was involved, four months ago? Why weren't we told then that some money was taken, four months ago? You know, you know, common sense tells us that we're looking at it right now for the first time. And a weapon, I have the right to find out all about that weapon, have it analyzed. Anyway, I know you said that I have a right to make this motion for continuance in the morning.
"THE COURT: What I'd like you to do is to get with the District Attorney's office and I'd like for you all to give him anything and everything that he's entitled to.
"MR. MARSAL: But, Judge, how can I ... say they give it to me right now, say they gave it to me Friday, how can I have the time to prepare?
"THE COURT: I don't know. I don't ...
"THE MARSAL: No way human.
*755 "THE COURT: ... know but the case has been set for trial for quite some time and its been continued before once on your motion and once by agreement.
"MR. MARSAL: But this is the first time any weapon's been ...
"THE COURT: Well, what I want you to do is to address yourselves to the issues this afternoon, see what the problems are and then talk with me about it in the morning. And you can file a motion, if you wish, at that time to continue and I'll rule on it at that time.
"MR. MARSAL: Well, we'd like for the record to show that we except to the Court's ruling."
At the hearing the next morning, the following occurred:
"MR. MARSAL: It's utterly ridiculous I submit to this Court for this Defendant to have incurred what he has incurred with a faulty indictment because as to the wisdom of any trial lawyer he knows that the burden is on the State to prove what they're alleging in that indictment and the law that was effective at that time.
". . . .
"THE COURT: The Court is of course ever mindful of the fact that the Defendant is literally on trial for his life and we intend to assist you in any way that we can in preparing your case because of the late indictment. Now if you need the assistance of the Court or any of our facilities to obtain the appearance of witnesses and that sort of thing, we'll try to help you.
"Now if you can tell me how you have been prejudiced specifically with respect to your preparation of your defense in light of the new indictment, it might be helpful to me in making a decision on your motion.
"MR. MARSAL: All right, sir. Whenever a weapon is alleged to be a part of the proof, a part of the charge or a part of the proof, I have a right to know about that weapon, where it came from and subpoena witnesses as to whether such weapon was in existence, whether ... who owned it, where it came from, what caliber it was in order to defend a charge that a weapon was being used by my Defendant. As it is now, I submit to the Court, that is a gross abuse of our rights not to have knowledge, you know, less than 12 hours or about 12 hours ago that a weapon was involved.
"I'llYou know, as an officer of this Court, I have never in my life talked to this man about a weapon. You know, never had an opportunity to know anything about it. And I submit to the Court, how can I have a weapon examined and have it analyzed for prints or caliber or balistics or anything without having, you know, prior knowledge. And just common sense dictates to us it takes time to do this. If it has taken him almost two years, Judge, to find out that there was a weapon and telling us about it at the last minute, I'm certainly entitled to have that ability toI cannot properlyI feel like an idiot to sit here to represent a young man whose life is on the line where they complain a gun was used and so forth.
"Another aspect about money. What witness have I had the right to talk to or subpoena to this Court about any robbery? You know, let's assume that there was neverhere's an allegation of kidnapping in one indictment and a rope, and now we've got an indictment with robbery, billfold, guns; entirely foreign to us.
". . . .
"MR. HARRISON: Judge, I don't have a weapon so-to-speak, a gun. We have oral testimony concerning a gun from witnesses who have been on the list that have [sic] been provided to Mr. Marsal some time ago.
". . . .
"THE COURT: I asked both of you to discuss the matter yesterday afternoon. Did you do that?
"MR. MARSAL: He told me yesterday afternoon what he expected the evidence to be under this new indictment. Yesterday afternoon.
"THE COURT: Well, what I'm asking you is what other evidence would you want to present with respect to this new indictment?
*756 "MR. MARSAL: I'd want the opportunity to defend it by having witnesses that, you know, I can talk to about a robbery, about a billfold, about a gun. I don't know of any witnesses. You know, it's impossible to ...
"THE COURT: I don't know that passing the case is going to produce any more witnesses, Mr. Marsal.
"MR. MARSAL: It'll give me an opportunity to talk to somebody to find ...
"THE COURT: All of these incidents allegedly arise out of the same occurrence, don't they?
"MR. HARRISON: Yes, sir. Judge, I have not ...
"THE COURT: The same witnesses are involved, aren't they?
"MR. HARRISON: ... I have not added a single witness. The witnesses are the same and they have been on the list that have [sic] been given to Mr. Marsal.
"MR. MARSAL: I don't defend the case with his witnesses though. I defend it with my witnesses. You know, that would be ridiculous. I'm charged with an offense and I'm gonna rely on what the State of Alabama tells me? That's a mockery I submit to the Court. This man has a right to subpoena his own witnesses.
"THE COURT: Well I assume that you've talked to whatever witnesses you wanted to talk to and subpoenaed whatever witnesses you would want. I wouldn't think that the facts would be changed by the indictment.
"MR. MARSAL: There is no allegation of any gun. I don't know anything about a gun. Hadn't talked to ... Hadn't even talked to the Defendant about a gun. Hadn't talked to anyone about any money in a billfold; hadn't talked to the Defendant about it.
"I submit to the Court, you know, that his constitutional rights to have an opportunity to ... well, you know, it's elementary when a man enters a plea of guilty you like any other Judge reads off his rights; you have a right to subpoena witnesses, you have a right to have witnesses ...
"THE COURT: Mr. Marsal that's what I'm telling you. The court will issue whatever subpoenas you need and you you may talk to the Defendant right now. He's sitting right beside you. And if you wish I'll make ...
"MR. MARSAL: Judge, that's no ... that's inhumane to me. How in the world can I sit here or stand here today, defend a man with capital murder and you tell me I can do it right now.
"THE COURT: I don't know.
"MR. MARSAL: It's impossible.
"THE COURT: You haven't told me one single reason why I should pass this case that's good or sufficient as far as this Court is concerned. I'm asking you to tell me why the case should be continued. What evidence will you present? Now if you want an opportunity to talk to your client or whatever witnesses, go ahead and do it right now and then come back hereI thought you were going to do that this morningand tell me what evidence you wish to present.
"MR. MARSAL: I've been in my office ...
"THE COURT: And if it's going to necessitate a continuance of this case, the Court will have no alternative but to grant a continuance. But you're going to have to tell me what evidence you would expect to adduce at the trial which would be different under the new indictment.
"You want an opportunity to talk to your client?
"MR. MARSAL: I do, but that doesn't waive my position. I will talk to him but, you know, Judge, I don't think that the Court ... you know, we're not here but for one purpose and that's to administer justice.
"THE COURT: Mr. Marsal, we all understand that. We all understand that. But you must tell me why the case must be continued. For all I know there will be no more witnesses if the case is continued than there are today.
"MR. MARSAL: Maybe not but ...
"THE COURT: How long is it going to take you to find that out? *757 "MR. MARSAL: The defense counsel would at least have the right to know whether there are any witnesses or not.
"THE COURT: Mr. Marsal, the Court knows that you are a very experienced and a very successful attorney and that you have well prepared your case. And I want you to go talk with your client and tell me if the Court may assist you in any way in contacting any witnesses.
"Sheriff, will you take the defendant back in my ...
"MR. MARSAL: Judge, let me interrupt you. Yes, I was prepared when my client was charged with strangling him with a rope or attempting to abduct Michael Donald, about terrorizing him. That's what I was able and prepared to defend. I was not and am not prepared to defend the charge that he committed a theft of one dollar in lawful currency from the wallet of Michael Donald and that with intent to put him in fear, feloniously caused his death and he committed robbery and as was alleged about a weapon being involved. I'm not permitted, I mean I'm not prepared to answer that.
"THE COURT: All right. I want you to go talk with your client and whatever witnesses you want and let me know what other evidence you would expect to adduce if this case is continued. And that's what I want to know.
"All right. Sheriff, will you take him back to my jury room? And I'll be in recess until that time."
After conferring with his client, defense counsel did not further argue the need for a continuance. When the judge asked "Do you want to speak further on the motion for continuance?" defense counsel responded, saying, "I have no information relative to witnesses that we had subpoenaed pursuant to the allegations of the charge as relayed in the indictment and I would like the opportunity to know whether those witnesses are here." The names of the witnesses that had been subpoenaed by the defense were read and it was determined whether they were available for trial. Thereafter, the court stated, "Mr. Marsal, I can only assume that we can procure the attendance of these witnesses if their attendance can be obtained at all. But your motion for continuance is denied." Thereafter, the defense waived the constraints of § 15-14-2,[2]Code of Alabama 1975, and jury selection commenced.
It is well established, and the parties herein recognize, that granting or refusing a motion for a continuance is a matter within the sound discretion of the trial court. Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940), Lindsay v. State, 15 Ala. 43 (1848), Dawkins v. State, 455 So.2d 220 (Ala.Cr.App.1984). And as we said in Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App.1984):
"`The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion." Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).' Beauregard v. State, 372 So.2d 37, 43 (Ala. Cr.App.), cert. denied, Ex parte Beauregard, 372 So.2d 44 (Ala.1979). `This Court must determine whether or not there has been an abuse of discretion in light of the circumstances of each case, looking particularly to those reasons the defendant presented to the trial judge.' Tucker v. State, 429 So.2d 1165, 1169 (Ala.Cr.App.1983)."
Therefore, we must look at the reasons the appellant presented to the trial judge to support his motion for a continuance, in order to determine whether he made a "positive demonstration of abuse of judicial discretion."
At the arraignment, the trial judge anticipated a request for a continuance; therefore, after hearing some argument on the motion, he scheduled a pre-trial hearing for *758 the following day. At this hearing, the appellant's attorney gave the following reasons in support of his request. The new indictment, which had been returned the previous afternoon, changed the offense from abduction-murder to robbery-murder; and he had never talked to his client nor any of the witnesses regarding a robbery. These reasons were countered by the knowledge of defense counsel that the first indictment was an unsuccessful attempt at charging a capital offense,[3] and that the evidence the State contemplated using, both testimonial and real, was the same for either indictmentall of the incidents allegedly arose out of the same occurrence involving the same witnesses, as to both of which defense counsel was knowledgeable.
This latter point is what appears to have influenced the trial judge the most. He advised the appellant's attorney that a continuance would be granted, "[b]ut you're going to have to tell me what evidence you would expect to adduce at the trial which would be different under the new indictment."
The prosecution's case hinged upon the testimony of one witness, James "Tiger" Knowles, the appellant's cohort in crime. According to the record, his testimony constituted more than one-fourth of the State's entire case. We are therefore of the opinion that the following language aptly applies:
"[W]e are unable to see how more preparation would have significantly changed the course of the trial. The essence of the case against [the appellant] was the testimony of the co-conspirators. They were effectively cross-examined and their testimony rebutted by [the appellant]. The jury apparently believed the co-conspirators."
United States v. Uptain, 531 F.2d 1281, 1289 (5th Cir.1976). Likewise, in the instant case, appellant's attorney subjected all of the State's witnesses, especially the co-conspirator, to a thorough and sifting cross-examination.
As stated above, the appellant had the burden of proving, and was granted the opportunity to show, actual prejudice. "There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657, 667 (1984). The following language in that case explains such circumstances:
"Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in Davis v. Alaska, 415 U.S. 308, 39 L.Ed.2d 347, 94 S.Ct. 1105 (1974), because the petitioner had been `denied the right of effective cross-examination' which `"would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."' Id., at 318, 39 L.Ed.2d 347, 94 S.Ct. [at] 1111 (citing Smith v. Illinois, 390 U.S. 129, 131, 19 L.Ed.2d 956, 88 S.Ct. 748 [749] (1968), and Brookhart v. Janis, 384 U.S. 1, 3, 16 L.Ed.2d 314, 86 S.Ct. 1245 [1246] (1966)).
"Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. Powell v. Alabama, *759 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55, (1932), was such a case."
United States v. Cronic, 466 U.S. at 659, 104 S.Ct. at 2047, 80 L.Ed.2d at 668 (footnotes omitted). See also Chadwick v. Green, 740 F.2d 897 (11th Cir.1984).
Powell v. Alabama is not applicable to the facts herein. Although also involving a capital offense, there was no actual appointment of counsel until the morning of trial, when an out-of-state attorney volunteered to assist the defendants. He was, however, unwilling to represent the defendants because he had not prepared a case nor was he familiar with local procedure. This problem was alleviated when a member of the local bar also came forward on the morning of trial, stating that he would assist the Tennessee lawyer and saying, "I will go ahead and help do anything I can do."
We do find guidance, however, in another capital case. In Avery v. Alabama, supra, the trial commenced three days after arraignment and the initial appointment of counsel. In that case, a motion for continuance was likewise premised on the claim of insufficient time within which to investigate and prepare a defense. Nevertheless, the Supreme Court held that given the circumstancesthe evidence and witnesses were easily accessible to appellant's attorneyit was not unreasonable to expect the attorney to be able to adequately prepare the case for trial during that period of time. A noteworthy similarity between Avery and the instant case is that "[t]here is no suggestion in the record that there were any witnesses to the killing other than those who testified." Id. 308 U.S. at 448, 60 S.Ct. at 323. As for the present appellant, such is also true for the robbery.
If, based on the new indictment, there were other defense witnesses that could have been called, the appropriate time to present the argument to the court that the motion for continuance should have been granted, would have been at the hearing on the motion for new trial. At that hearing, the appellant did raise newly discovered evidence/witnesses; however, the new witnesses did not go to the new indictment issue. Presumably, if there were other witnesses that the defense would have discovered, they would have been presented to the trial court at the motion for new trial hearing. The fact that this did not occur lends support to the trial court's decision that the motion for a continuance was due to be denied. As related above, the "presumption-of-prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." Chadwick v. Green, supra, at 901. We know of no case wherein the presumption-of-prejudice analysis has been applied to facts similar to those herein. We are not predilective toward expanding the "presumption-of-prejudice" test. It was incumbent upon the appellant to prove actual prejudice as per the requirements of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This he has not done. Because the appellant was unable to demonstrate at the pre-trial hearing how he was prejudiced, we adopt the holding in United States v. Uptain, supra, at 1291: "Where, as here, it is possible to see how denial of continuance resulted from a reasonable resolution of the various factors confronting a court, we will uphold its action, even if it may seem somewhat harsh." In so holding, however, we do not mean to condone like conduct in future similar circumstances.[4] Any slight change in the circumstances *760 very well may change the outcome.

II
The appellant argues that the State failed to present sufficient evidence to prove the requisite aggravating circumstances of § 13A-5-31(a)(2), Code of Alabama 1975, ("Robbery or attempts thereof when the victim is intentionally killed by the defendant") as charged in the indictment. He relies upon Beverly v. State, 439 So.2d 758 (Ala.Cr.App.1983).
In that case, Matthew Beverly was convicted of the capital offense involving the intentional killing and robbery of Scott Deroo. The defendant and his accomplices picked up the victim and his girlfriend hitchhiking in Birmingham. "At some point along the way, the [victim's] duffel bag and orange backpack were placed in the trunk of the car to keep appellant's friend Bubba from having to hold the backpack in his lap" while en route to Huntsville. Upon arriving there, the defendant obtained a gun and, without being accompanied by his friends, he drove the two hitchhikers down a dirt road and into a field. There he shot the victim several times and raped the victim's girlfriend. Thereafter, he drove to a gas station, where the car would not re-start. He left it there, returning the next morning in another car and at that time removing the backpack and duffel bag from the car's trunk.
The events amounting to the offense occurred in April 1979, prior to the effective date of the new criminal code.[5] Therefore, the case was governed by the elements of common law robbery, which required that the force or fear precede or be concomitant with the taking. See Commentary following § 13A-8-44. Because the common law principles governed, we had to reverse the conviction; however, we did note the following:
"Our new Criminal Code significantly broadened the scope of common law robbery by adding new methods of committing that crime. Section 13A-8-41, 42, 43. Under these sections ... the defendant's conduct here might well be deemed to constitute robbery. Commentary following Section 13A-8-44."
Beverly v. State, 439 So.2d at 762. In the case sub judice, the events occurred after the effective date of the new criminal code, and, therefore, the appellant's reliance on Beverly, supra, is misplaced.
Under the broader criminal code definition, first degree robbery is committed when a person, while armed with a deadly weapon and in the course of committing a theft, "[t]hreatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property." § 13A-8-43(a)(2), Code of Alabama 1975. Theft occurs when a person "[k]nowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property." § 13A-8-2(1), Code of Alabama 1975. And to deprive means "[t]o withhold property or cause it to be withheld from a person permanently or for such period or under such circumstances that all or a portion of its use or benefit would be lost to him." § 13A-8-1(2)(a), Code of Alabama 1975.
Applying these definitions to the facts before us, it is clear that the State presented sufficient evidence to prove each element. The victim was forced into the back of the car, after which the appellant's accomplice, Mr. Knowles, held a gun on the victim and instructed him to empty his pockets. Knowles testified, "He emptied his pockets and everything he had in his pockets I laid on the floorboard of the car, *761 the automobile that we went in." The items were never returned. The fact that Mr. Knowles, and not the appellant, held the gun and demanded that the victim empty his pockets while the appellant was driving, does not negate the appellant's culpability. He is legally accountable for Knowles's acts, as per the complicity statute, § 13A-2-23, Code of Alabama 1975, and "[w]here more than one person participates in a robbery it is immaterial which one takes the property." Sanders v. State, 423 So.2d 348, 351 (Ala.Cr.App.1982).
The appellant argues further that there was never an intent to "take the property of the victim; that the acquisition of the victim's property was not the primary goal. Knowles told the victim to empty his pockets in order to be sure that the victim did not have a weapon. There was no evidence whatsoever to show that the Defendant coveted anything belonging to the victim." (Appellant's supplemental brief, p. 3) This argument assumes that robbery only occurs if money is the object sought to be obtained. Theft is the unauthorized control over property, which is defined as including tangible or intangible personal property. See § 13A-8-1(10), Code of Alabama 1975. The appellant admits that he sought to deprive the victim of any weapons he may possess. A weapon would be property according to the statutory definition. What type of property the appellant intends to deprive the victim of is therefore immaterial.

III
During the direct examination of Mr. Knowles, the prosecutor sought to establish that Knowles and the appellant had previously been to the location where they took Mr. Donald and murdered him. The witness testified that "three or five days prior to the incident with Michael Donald," he and the appellant had gone to this same location in Baldwin County "[t]o take a homosexual over there and to beat him and let him go." The appellant's attorney objected and requested a mistrial. The trial court ruled that the testimony was "admissible at least for the purpose of showing that [the appellant] had been there before," and added, "I question whether or not the motive of the defendant and the witness in taking him over there would be admissible. Do you contend that is admissible?" The prosecutor argued that such would be admissible to show "pattern and scheme." The trial court thereafter instructed the jury as follows:
"THE COURT: Ladies and gentlemen, during the testimony of the witness who is now on the stand there was testimony from the witness that he and the Defendant had been to this location where this allegedly occurred on a previous occasion and that at that time there was a homosexual with them. The fact that the witness testified that they had been there before on a previous occasion would be admissible evidence and the Court would permit that. As to the purpose or who was with them on a previous occasion and what happened would not be admissible.
"I must ask each of you under the oath that you have taken as jurors if you can exclude that portion of the answer which dealt with the homosexual and anything other than the fact that the witness testified they had been there before. And I'm going to ask each of you individually if you can put that out of your minds and not consider that as evidence in this case because the Defendant is not charged with anything other than a capital offense involved in this particular case for the alleged killing of Michael Donald. Now let me ask each of you if you can put that aside and consider only the legally admissible evidence.
"(The Court polls the jurors.)
"THE COURT: Let the record reflect that all of the jurors have responded in the affirmative. And would you two please approach the bench. Carol, bring your pad."
It is an elementary principle of our law that the grant or denial of a motion for a mistrial is a matter within the sound discretion of the trial court, and will be disturbed on appeal only upon a showing of manifest abuse. See generally, Ala.Digest, *762 Criminal Law, Key Nos. 867, 1155. Furthermore, "[t]he granting of a mistrial is an extreme measure and should not be granted where the prejudicial qualities of an improper remark can be eradicated by the action of the trial court." Wood v. State, 416 So.2d 794, 800 (Ala.Cr.App.1982). See also Ala.Digest, Criminal Law, Key No. 867.
Assuming that the trial court correctly ruled that the testimony regarding the beating of a homosexual was inadmissible, we believe that the prejudicial effect of such testimony upon the jury was cured by the judge's curative instructions and the subsequent polling of the jury. The trial court's denial of the request for a mistrial was not error.

IV
The appellant contends that a new trial should have been granted based on a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and because of newly discovered evidence. The factual bases for the two grounds are intertwined, for they both involve an attempt to cast blame upon another individual.
Brady v. Maryland, supra, holds as follows:
"[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
"A prosecution [sic] that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not `the result of guile,' to use the words of the Court of Appeals. Brady v. State, 226 Md. 422, 427, 174 A.2d 167, 169 (1961)."
373 U.S. at 87-88, 83 S.Ct. at 1196-97. The question, then, becomes whether the evidence "withheld" was exculpatory.
The evidence the appellant complains that the State failed to provide to him consists of a pair of boots and a jacket, personal items of Ralph Hays,[6] the individual the defense contends was the true accomplice of Mr. Knowles, and a drawing depicting, among other things,[7] a hangman's noose suspended from a tree limb, a syringe and a tombstone. Additionally, appellant's counsel represented to the court that he had received a phone call from a woman who identified herself as Linda Chestang. She claimed that Ralph Hays had told her that he committed the murder, and she alleged that when he made that statement to her, he had blood on his clothes. She also told counsel about the drawing, its location when it was seized, and that the jacket had been washed in the washing machine at the home of Ralph Hays's mother. It was determined that "Linda Chestang" was staying at a motel in Gulf Shores, but she failed to appear in court as she promised, and, in fact, she disappeared.
The State presented testimony that "Linda Chestang" was probably actually Linda Odom. She was living with Ralph Hays on the date in question, and, according to Sgt. Wilbur Williams, they and another couple "were involved in an altercation at 1202 Dauphin Street in the earlier part of the night the `night' that Michael Donald was killed" and "because of the fact that they were out on the street and involved in this other altercation, they were investigated as suspects." However, after questioning, they were released. Thereafter, Ralph Hays and the others were arrested and *763 charged with the murder, based on the preliminary hearing testimony of Johnny Ray Kelly and a juvenile girl named Latrinathat on the night of Michael Donald's murder they had seen Ralph Hays with blood on his shirt and that he had said that he and the two others had "pistol whipped a nigger." Latrina subsequently recanted her statement and admitted that she had lied; Johnny Ray Kelly was convicted of perjury for lying during the preliminary hearing. The grand jury thereafter "no billed" the case against Ralph Hays and the two others.
The above facts were elicited on February 1, 1984, during the appellant's motion for continuance of sentencing and/or new trial. The motion was denied by the trial judge, who stated, "I'm not so sure that under the law this does constitute newly discovered evidence. It's evidence that could have been discovered previously, I think." At the conclusion of that day's sentencing hearing, the court stated, "I have issued a subpoena for [Linda Odom] and I do want to find out if we can get her here if this is one in [sic] the same that you are looking for." The following morning, the sentencing proceeding continued.
"THE COURT: Mr. Galanos, did we secure the location of that witness?
"MR. GALANOS: No, sir. Judge, briefly stated, Mr. Wright who is present, an investigator for my office, went to Route 2, Box 857 and Route 2, Box 851 in Irvington yesterday afternoon and spoke with a Mrs. Lee. She stated that Linda Odom was formerly her sister-in-law. Mrs. Lee advised that to her knowledge Ms. Odom was in New Orleans but could provide no particulars as to her residency, employer, friends, etc. Mrs. Lee stated that she was unaware of any means by which Odom could be contacted. Mrs. Lee further advised that Linda Odom used the Irvington address solely as a place to have her mail delivered and would on occasion come by and pick it up. Mrs. Lee further advised that it had been two or three months since Odom's last visit. Out of an abundance of caution a subpoena was left with Mrs. Lee.
"We further checked the Paradise Island Motel, phone number 968-6811, at Gulf Shores because that was the motel and the phone number that Mr. Marsal had gave [sic]. We spoke with a Ms. Sue Johnson, the manager of that motel, who stated that there was no Linda Odom, no Linda Chestang nor was there a Linda Johnson registered.
"In sum we've done all we could to find the woman and cannot find her.
"THE COURT: Anything else, Mr. Marsal?
"MR. MARSAL: No, sir."
As with a motion for a mistrial, the grant or denial of a motion for new trial is largely discretionary with the trial judge, whose decision will not be disturbed absent a clear showing of abuse, and in reviewing his decision, appellate courts will indulge every presumption in favor of the correctness of his decision. See cases collected at Ala.Digest, Criminal Law, Key No. 911. Under the facts in the record, there was no way of knowing when, if ever, Linda Odom, or "Linda Chestang," would be located and available to testify. We do not believe that the trial court abused its discretion and erred in its ruling regarding the appellant's newly discovered witness.
We also do not believe that the trial court abused its discretion and erred in its ruling regarding the appellant's newly discovered evidence, namely, the drawing, the jacket, and the boots. To warrant the granting of a new trial, the newly discovered evidence must be such that it could not have been discovered prior to trial with the exercise of due diligence, and such as to render probable a different result if a new trial were to be granted. Taylor v. State, 266 Ala. 618, 97 So.2d 802 (1957), Young v. State, 346 So.2d 509 (Ala. Cr.App.1977), Lackey v. State, 41 Ala.App. 46, 123 So.2d 186, writ denied, 271 Ala. 699, 123 So.2d 191 (1960), Lassiter v. State, 38 Ala.App. 287, 83 So.2d 365, cert. denied, 263 Ala. 618, 83 So.2d 369 (1955). The sole purpose for using such evidence would be to attempt to raise a reasonable doubt in the minds of the jurors that Ralph Hays *764 was the culprit, and not Henry Hays. With that same evidence, a grand jury had previously determined that there was insufficient evidence to support an indictment against Ralph Hays. If the appellant had been granted the opportunity to present such evidence to a jury, the State would have been allowed to go into the entire transaction and explain it away. Johnson v. State, 265 Ala. 360, 91 So.2d 476 (1956), Sales v. State, 446 So.2d 703 (Ala.Cr.App. 1983), Brown v. State, 37 Ala.App. 595, 74 So.2d 521, cert. denied, 261 Ala. 696, 74 So.2d 524 (1954).
Regarding appellant's argument that he was entitled to disclosure of such evidence, we think it appropriate to quote the United States Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976):
"The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the `sporting theory of justice' which the Court expressly rejected in Brady. For a jury's appraisal of a case `might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.
"... And this Court recently noted that there is `no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' Moore v. Illinois, 408 U.S. 786, 795 [92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972)]. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense."
427 U.S. at 108-10, 96 S.Ct. at 2400. Then, how does one determine "materiality?" The Court stated that the "proper standard of materiality" is
"[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."
Id., at 112-13 [96 S.Ct. at 2402]. Furthermore, as the Court has said previously, even constitutional error may be harmless, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), such as when there is overwhelming evidence of guilt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). See also United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (invalid line-up identification), Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (search and seizure), Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (Massiah violation), Harryman v. Estelle, 616 F.2d 870 (5th Cir. 1980) (en banc) (Miranda violation), and Neelley v. State, 494 So.2d 669 (Ala.Crim. App.1985) (pending on certiorari). Nevertheless, as stated above, we believe that the trial judge ruled correctly, but, as can be seen, even if he was incorrect, such error does not in this case necessitate a reversal.

V
The last issue the appellant raises is that "the trial court cannot disregard the jury's recommendation of life without parole and sentence the accused to death by electrocution." He bases his argument on the fact that the offense herein was committed prior to July 1, 1981, the effective date of the new capital offense statute, §§ 13A-5-39 *765 through 13A-5-59, Code of Alabama 1975. Therefore, his offense was governed by §§ 13A-5-30 through 13A-5-38, Code of Alabama 1975, as interpreted in Beck v. State, 396 So.2d 645 (Ala.1980). Such is specifically stated to be the proper procedure. See § 13A-5-57, Code of Alabama 1975.
It is well established that now the judge does have the authority to sentence a defendant to death even though the jury has recommended life without parole. Ex parte Jones, 456 So.2d 380 (Ala.1984), Ex parte Harrell, 470 So.2d 1309 (Ala.1985), Crowe v. State, 485 So.2d 351 (Ala.Cr.App. 1984) (pending on cert.), Lindsey v. State, 456 So.2d 383 (Ala.Cr.App.1983), aff'd, 456 So.2d 393 (Ala.1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985), Murry v. State, 455 So.2d 53 (Ala.Cr.App. 1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). However, each of those cases involved offenses that occurred after July 1, 1981.
As stated in Beck v. State, supra, the third-stage sentencing hearing occurs only when the jury has returned a sentence of death, and the judge then has the discretion to set sentence at death or life without parole. If the jury returns a sentence of life without parole, then the third-stage sentencing hearing does not occur. At the appellant's trial, the jury returned a sentence of life without parole; therefore, under the law as it was at that time, a third-stage hearing was inappropriate. Beck v. State, supra. See also J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala. L.Rev. 213, 329 (1982). Because the trial judge incorrectly held a third-stage hearing, at which he set the appellant's sentence at death, the death sentence must be set aside and the case remanded for the trial court to enter a sentence of life without parole as determined by the jury.
SENTENCE SET ASIDE; REMANDED WITH DIRECTIONS.
TYSON and PATTERSON, JJ., concur.
BOWEN, P.J., dissents with Opinion.
McMILLAN, J., concurs in the dissent.
BOWEN, Presiding Judge, dissenting.
I vigorously and fervidly dissent from the opinion of the majority. The change of crimes charged in the indictment less than one full day before Hays was scheduled for trial is so fundamentally unfair that prejudice must be presumed and a new trial granted. The majority recognizes that Hays was "ambushed" but excuses such shocking conduct on the basis of harmless error. The majority "deplores" the prosecutor's conduct and characterizes it as "smack[ing] of `justice by ambush,' "but pardons the tactic because "there was no showing of actual prejudice." This holding misses a fundamental principle of both civil and criminal trial practicethe vital importance of thorough preparation and accurate investigation. The majority's decision accents the fact that appellate judges are far removed from the trial itself and from the practical and very real struggle involved in either prosecuting or defending a criminal case.
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States held that "counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." The refusal to grant the requested continuance effectively denied defense counsel the opportunity to exercise those duties.
The prejudice in this case is obvious and apparent. If the indictment is "the compass and North Star of any criminal prosecution," Hatton v. State, 359 So.2d 822, 831 (Ala.Cr.App.1977), cert. quashed, 359 So.2d 832 (Ala.1978), then Hays and his counsel were given the wrong directions. The day before trial was simply too late to change course. Defense counsel prepared his case to meet what was charged in the indictment. Obviously, he questioned witnesses about the crime charged. By switching charges at the last possible minute, *766 the prosecution destroyed the basis on which the defense was predicated.
The defense had been misled and misinformed. Having prepared a defense to one specific charge, the accused was forced to trial upon another. Defense counsel's statement of prejudice was as clear and convincing as it could have been. How could counsel state that which he did not know? Counsel could know how the new indictment affected his defense only after he had interviewed the witnesses about the new charge. Counsel's statement that he had prepared to defend against one charge but was being forced to trial on another is a damning definition of prejudice.
The heart of due process of law is fundamental fairness. "Of course due process requires that the accused shall have reasonable opportunity to meet the charges that have been filed against him." Ex parte Seymore, 264 Ala. 689, 692, 89 So.2d 83 (1956).
Hays' conduct is abhorrent and shocking, cowardly and indicative of a mindless racism and moral depravity that is closer to a purulent disease than an attitude. Yet, "the guilty, as well as the innocent, must be accorded due process of law." Duncan v. State, 278 Ala. 145, 173, 176 So.2d 840 (1965).
"The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. As much as we may regret some results of the law, the law must be preserved if this constitutional democracy is to survive." Watts v. State, 282 Ala. 245, 248, 210 So.2d 805 (1968).
It is important not only that the guilty be convicted, but that they be properly convicted. This same point was made in Hubbard v. State, 283 Ala. 183, 186, 215 So.2d 261 (1968), vacated in part, 408 U.S. 934, 92 S.Ct. 2851, 33 L.Ed.2d 747 (1972):
"Another way of stating an argument could be that in a particular case, who is harmed when a guilty defendant is convicted by illegal evidence. It has been so argued throughout history that, why object to convicting the guilty by illegal means when the same objective could be reached by legal means. The principle that `the ends justify the means' has no place in constitutional law. Countless skeletons repose in the historical dungeons of the world giving mute testimony to the error of such argument. Today, it could be the guilty convicted by illegal means! Who knows whether tomorrow it would not be the innocent?"
I cannot condone what occurred in the trial court. For that reason, I would reverse the judgment of the circuit court and remand this case for a new trial.
McMILLAN, J., concurs.

ON APPLICATION FOR REHEARING
TAYLOR, Judge.
The attorney for the appellee vigorously argues that the jury's determination of sentence of life without parole was not binding upon the trial judge. To hold otherwise, he contends, amounts to allowing a single juror, who refuses to vote for death, to set the defendant's sentence at life imprisonment without parole, for to return a sentence of death, the jury's vote must be unanimous. The appellee contends that allowing a jury's determination of sentence to be binding upon the trial judge results in arbitrary and capricious death sentences violative of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The United States Supreme Court does not share in the appellee's concern. In fact, that court has recognized that a vast majority of the states with capital punishment statutes provide for jury sentencing without giving the trial judge the authority to increase to death a jury's determination of sentence of life imprisonment without parole.
"We also acknowledge the presence of the majority view that capital sentencing, unlike other sentencing, should be performed by a jury. As petitioner points out, 30 out of 37 jurisdictions with a capital-sentencing statute give the life-or-death decision to the jury, with only 3 of the remaining 7 allowing a judge to override a jury's recommendation of life.9"
*767 "9 Twenty-nine jurisdictions allow a death sentence only if the jury recommends death, unless the defendant has requested trial or sentencing by the court.... In Nevada, the jury is given responsibility for imposing the sentence in a capital case, but if the jury cannot agree, a panel of three judges may impose the sentence.... In Arizona, Idaho, Montana, and Nebraska, the court alone imposes the sentence.... Besides Florida, the only states that allow a judge to override a jury's recommendation of life are Alabama and Indiana." (Citations omitted.)
Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 3164-65, 82 L.Ed.2d 340 (1984). This case refers to the new Alabama procedure under § 13A-5-46, Code of Alabama 1975, enacted after this case was tried, which allows the trial judge to override the jury's recommendation.
The jury herein did not return a sentence of death. It is clear and not disputed, that if they had done so, the trial judge would not have been bound by their determination of sentence. §§ 13A-5-32 and 13A-5-33, Code of Alabama 1975. However, when the jury returned a sentence of life imprisonment without parole, the trial judge was bound by their determination.
"The court shall instruct the jury that in determining whether to fix a punishment of death, the jury must weigh the aggravating and mitigating circumstances in determining whether to fix the punishment at death....
"If the jury cannot agree on a sentence of death, the defendant shall be sentenced to life imprisonment without parole. If the jury fixes the punishment at death, the court shall hold a hearing as mandated by § 13-11-3 and § 13-11-4."
Beck v. State, 396 So.2d 645, 663 (Ala.1980) (emphasis added). Therefore, under the procedure established in Beck, after having determined guilt, the jury then chooses between sentences for death or life without parole, and if they choose the latter, the defendant shall be so sentenced. Only if they choose death is the trial judge authorized to hold another hearing, after which he has the discretion to reduce the sentence or to order the death penalty. See also J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 324 (1982): "[T]he Beck procedure authorizes the jury to fix punishment at death in its verdict, but requires a sentence of life imprisonment without parole if the jury is unable to agree to impose the death penalty. The trial judge can impose a sentence of life imprisonment without parole even if the jury recommends death, but the judge cannot impose a death sentence under the 1975 act in the absence of a jury verdict imposing that sentence."
The appellee attempts to substantiate the contention that the jury's determination of sentence was not binding upon the trial judge by citing the heading to § 13A-5-33, Code of Alabama 1975: "Determination of sentence by court; court not bound by punishment fixed by jury." Initially, we point out that the headings "do not constitute part of the law, and shall in no manner limit or expand the construction of any such section." § 1-1-14, Code of Alabama 1975; Reed v. State, 372 So.2d 872 (Ala.Cr.App.1978), rev'd on other grounds, 372 So.2d 876 (Ala.1979). The text of § 13A-5-33, Code of Alabama 1975, is prefaced with the jury's having first set the punishment at death, apparently thus having no application to situations wherein the jury returned with a determination of sentence of life imprisonment without parole. However, when the 1975 Death Penalty Act was drafted, the statutory scheme required the jury to return with a death sentence if they found the defendant guilty of a capital offense. "If the jury finds the defendant guilty, it shall fix the punishment at death...." § 13A-5-31(a), Code of Alabama 1975. Therefore, a jury could not return a sentence of life imprisonment without parole. Thus, no legislative intent can be gleaned from that statute because the legislature did not provide for a jury to be able to return with a determination of sentence of life imprisonment without parole. This occurrence was made possible, however, by the decision in Beck, wherein the jury was given the optional sentence of life imprisonment without parole.
Therefore, our interpretation that the trial court did not have the authority to override the jury's determination of sentence of life imprisonment without parole is consistent *768 with our Supreme Court's decision in Beck.
Lastly, the appellee argues that if the trial court did not have the authority to override the jury's determination of sentence, then a new sentence hearing is required because the trial court charged the jury that their sentence verdict was a recommendation not binding upon the court. As we have heretofore determined, that instruction was incorrect. There was not, however, an objection, by either the state or defendant, to that instruction. It is well settled that issues cannot be raised for the first time on appeal. See cases collected at 6B Alabama Digest "Criminal Law" Key No. 1028. "Furthermore, when a court commits error in charging or commenting to a jury, an objection, sufficient to preserve the error for review on appeal, must be made before the jury retires." Showers v. State, 407 So.2d 169, 172 (Ala.1981). See also Rule 12, A.R.Crim.P. However, in death cases this court has the obligation to notice any plain error.
"In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, A.R.A.P. However, "[t]he plain error rule is limited to `cases in which the death penalty has been imposed'." McGinnis v. State, 382 So.2d 605, 607 (Ala.Cr. App.1979), cert. denied, 382 So.2d 609 (Ala. 1980); Cook v. State, 384 So.2d 1158 (Ala. Cr.App.), cert. denied, 384 So.2d 1161 (Ala. 1980). We interpret this to mean cases in which the death penalty has been legally imposed. Because the death penalty was not legally imposed, the plain error rule does not apply. Even if it did, the rule would not apply to this situation, because it only applies "whenever such error has or probably has adversely affected the substantial right of the appellant." We are bound by the wording of the rule, and we cannot say that the erroneous jury instruction substantially affected the appellant's rights.
OPINION EXTENDED; APPLICATIONS BY APPELLANT AND APPELLEE FOR REHEARING, OVERRULED.
All the Judges concur, except BOWEN, P.J., who concurs only as to issue raised on rehearing.
NOTES
[1] The appellant was indicted for violating § 13A-5-40(a)(1), Code of Alabama 1975. This statute, however, did not become effective until 12:01 a.m. on July 1, 1981. The act for which the appellant was indicted occurred in the early morning hours of March 21, 1981. Therefore, the application of this new statute to the appellant would have been ex post facto. According to the record, the appellant's attorney was aware that the indictment was seriously flawed and purposely declined filing certain motions that would have brought that flaw to the attention of the court or the district attorney's office.
[2] Section 15-14-2 provides, "No person shall be tried on an indictment presented by the grand jury until at least one entire day after the case has been placed upon the trial docket of the court, except with the consent of the defendant." The trial court interpreted "an entire day" to mean 24 hours, and because the appellant's arraignment occurred the day before at approximately 4 o'clock in the afternoon, a waiver was necessary.
[3] See Footnote 1, supra. We do not mean to imply that defense counsel was duty bound to bring such defect to the attention of the court or the prosecutor prior to trial, for the opposite is true. However, defense counsel knew that the State intended to have a capital indictment, and based on the known facts, infra, such a capital indictment would be valid if it charged robbery-murder.
[4] Of special concern to us were the actions of the prosecutor. He admits that the Friday before trial was to commence on Monday, he first learned that the indictment would not support a capital conviction. See footnote 1. The fact that some evidence was still out of state made it convenient to secure a one-day continuance, because the defense would consent based upon that reason. However, the glaring reason for the one-day continuance was so that a grand jury could be convened and a valid capital indictment returned. Why on Friday did not the prosecutor advise the court and the defendant of his intentions? The appearance of a likelihood of prejudice would have vanished if he had simply done so. The fact that this is a capital case serves to intensify the problem created. And in addition thereto, when the defense requested a continuance after the new indictment had been returned, although not formally objecting to the request, the record is clear that the prosecutor made known that he opposed the granting of the motion. We deplore any conduct which smacks of "justice by ambush." The only reason we are able to affirm the judge's ruling denying the defense motion is that there was no showing of actual prejudice.
[5] Section 13A-1-11, Code of Alabama 1975, provides that the new criminal code, Section 13A, "shall take effect at 12:01 A.M. o'clock on January 1, 1980."
[6] Although he has the same surname, he is not a relative of the appellant.
[7] The drawing was one of several in a sketchbook obtained during a search of Ralph Hays's house, 1202 Dauphin Street, which was located 75-100 yards from the dumpster in which the victim's wallet was discovered. Neither the drawing itself, nor a facsimile thereof, was offered into evidence by either party, and it is therefore not in the record. The State, in its brief, contends that the drawing depicts things other than the three items listed. The appellant does not refute this allegation in his reply brief.