886 So.2d 850 (2003)
Thomas Edwin BLANTON, Jr.
v.
STATE of Alabama.
CR-00-1665.
Court of Criminal Appeals of Alabama.
August 29, 2003.
Rehearing Denied October 24, 2003.
*857 John Charles Robbins, Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and Joseph G.L. Marston III, asst. atty. gen., for appellee.
BASCHAB, Judge.
In 2001, the appellant, Thomas Edwin Blanton, Jr., was convicted of four counts of first-degree murder, a violation of Title 14, § 314, Ala.Code 1940 (Recomp.1958), and his punishment was fixed at imprisonment for life on each conviction. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.
The evidence showed that, in 1963, the Sixteenth Street Baptist Church in Birmingham was frequently used in connection with the civil rights movement. On September 15, 1963, a bomb exploded near or under some steps at the church. As a result of the explosion, four young black girls  11-year-old Carol Denise McNair, 14-year-old Addie Mae Collins, 14-year-old Cynthia Wesley, and 14-year-old Carole Robertson  who were in the basement preparing for a church service were killed.

I.
The appellant's first argument is that the trial court erred when it allowed his former girlfriend to testify about his alleged prior bad acts toward and comments about black people. At trial, Waylene Vaughn Wise, who dated the appellant in the early 1960s, testified about the following acts that occurred in approximately late 1962 and early 1963:
1) On two occasions, the appellant went to a grocery store parking lot; pulled out a bottle that he said contained some kind of acid; explained that the acid would burn skin but would not burn fabric; and poured the substance on the seats of four or five vehicles that belonged to black people.
2) On another occasion, the appellant took what he said was a bottle of some kind of acid and went into a grocery store; came out and said, "`[T]hey'll be closing this damn place in a little bit because I just put it in the meat counter'"; and added, "`[T]his damn store is ran by Jews that wait on nobody but damn niggers.'" (R. 1207.)
3) One evening, she and the appellant drove past a black nightclub; the appellant took a bottle from under his seat, threw it at a group of black people who were patrons of the nightclub, and drove away; some of the patrons followed him in another vehicle, got in front of his vehicle, and blocked the intersection; some of the black people got out of their vehicle and threatened her and the appellant; the appellant pulled out a 45-caliber semi-automatic pistol, held it out the window, and chambered a round; and the black people got into their vehicle and left.
4) Finally, on one occasion, as a black male was crossing a street onto which he was turning, the appellant aimed his vehicle at the male and said, "`[A]ll I want is a chance to kill one of those black bastards.'" (R. 1211.)

A.
First, the appellant contends that Wise's testimony was not admissible pursuant to Rule 404(b), Ala. R. Evid., which provides, in pertinent part:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character *858 of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."
We addressed a contention similar to the appellant's in Chambliss v. State, 373 So.2d 1185, 1207-08 (Ala.Crim.App.1979), as follows:
"Evidence of appellant's membership in an organization such as the Ku Klux Klan, which espouses white supremacy and racial hatred, certainly furnishes a possible motive for the church bombing. The motive for a homicide is always a proper subject of inquiry and proof. Brothers v. State, 236 Ala. 448, 183 So. 433; Balentine v. State, Ala. Cr.App., 339 So.2d 1063; Bynum v. State, Ala. Cr.App., 348 So.2d 804.
"In cases where, as here, the evidence is circumstantial, a wide range of testimony is admissible to show the motive of defendant for committing the crime charged. Turner v. State, 224 Ala. 5, 140 So. 447; Harden v. State, 211 Ala. 656, 101 So. 442.
"In a case where the evidence is circumstantial, evidence of motive becomes of great importance. Harden v. State, supra; Hardy v. State, 51 Ala.App. 489, 286 So.2d 899. When circumstances point to the guilt of an accused, evidence of his motivation, even though weak, is admissible. In McClendon v. State, 243 Ala. 218, 8 So.2d 883, the Supreme Court said:
"`"When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of a motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible."'
"Appellant's membership in the Ku Klux Klan evidenced his hatred of black people and his willingness to resort to violence to vent his ingrained feelings toward that race. His criticism of this proof goes to its weight and credibility rather than to its admissibility."
We also addressed a similar contention in Stoner v. State, 418 So.2d 171, 183 (Ala.Crim.App.1982), as follows:
"Appellant next asserts that certain questions asked appellant concerning his views of the use of violence against minorities and his views of minorities in general constituted reversible error. We do not agree.
"Appellant, just prior to his questioning on this issue, emphatically stated that he had never advocated the use of violence against other segments of society. The majority of statements appellant was questioned about dealt with such use of violence. Thus the questioning was properly conducted to impeach the witness.
"Also, the remaining statements, if not directly advocating violence, certainly evidenced an intense hatred and aversion towards blacks and Jews. Such questioning was proper to prove motive for the bombing."
(Emphasis added.)
Likewise, in this case, Wise's testimony about the appellant's prior acts toward and comments about black people was relevant to show his motive for bombing the church. Therefore, Wise's testimony was admissible pursuant to Rule 404(b), Ala. R. Evid.

B.
Second, the appellant contends that the prejudicial effect of Wise's testimony substantially outweighed its probative value and that the testimony should have *859 been excluded pursuant to Rule 403, Ala. R. Evid. Specifically, he asserts that Wise never reported the acts about which she testified to law enforcement authorities; he was never questioned about, arrested for, or charged with any of the acts; and Wise's testimony was not corroborated. However, such concerns would affect only the weight the jury gave the testimony and not its admissibility. Further, the testimony about his prior acts and comments had an extremely high probative value for the reasons set forth previously. Finally, the trial court gave the following limiting instruction during its oral charge:
"Thomas Blanton is not on trial for any act, language, personal opinions or conduct which are not alleged in the indictment. Any such evidence presented in this trial may be considered only as evidence of motive to commit the acts charged, and then only if you judge the evidence to be plain, clear and conclusive as to the act, language, personal opinion or conduct. Such evidence may not be used to infer something about the defendant's general nature, and you cannot consider that the defendant is more likely to have committed the offense for which he is charged because of that general nature."
(R. 1879-80.) Therefore, the probative value of Wise's testimony was not substantially outweighed by its prejudicial effect.

II.
The appellant's second argument is that the trial court improperly admitted a recording of a June 28, 1964, conversation between him and his wife. On the recording, the appellant makes references to a meeting about making a bomb and being at the Modern Sign Shop to make a bomb.
In May 1964, John Colvin, who was an electronic technician for the Federal Bureau of Investigation ("FBI"), rented an apartment in the house where the appellant lived. His apartment shared a common wall with the appellant's kitchen. In June, he and Special Agent Ralph Butler installed some electronic equipment in his closet.
During the State's direct examination of Butler, the following occurred:
"[PROSECUTOR]: ... Tell the jury the nature of the place that you installed this equipment and how you did it, if you will, please.
"....
"[BUTLER]: And so [John Colvin] rented the place and I went out and took a look to see what type of equipment and what type of work we'd have to do to make the installation and found that the only way that I could see at the particular time to do some of the work was to  we had a common wall in our closet with the, supposedly, the kitchen area of Mr. Blanton. But to get from that closet area with the wiring necessary to get out of the place to hook the equipment to, John Colvin talked to Mrs. Blanton at that time and told her that we needed to put some shelving in the closet so that if we did any hammering and so forth, it would not be unusual. She said make all the noise you want. It's all right with me. So we went in and I  of course I did put some shelving in there. But also I had to take up some boards in the flooring in order to get the wire from one point to another.
"[PROSECUTOR]: Okay.
"[BUTLER]: And then, thereafter, found that there was a passageway, that is, between the walls. A passageway. You could see the little light which would give an air hole necessary for the installation of the microphone without having to penetrate or go physically into the other room. And that's the way we put that little microphone in there. *860 And then I touched those wires off the microphone into the recording equipment. And then hooked up the earphones so I could listen to it to see that it was working properly, because you have to do this step by step. And then, thereafter, ran it over to another location to monitor it.
"[PROSECUTOR]: Okay. Now when you're talking about putting the microphone in the common wall there, did you have to drill through the wall or the baseboard or something on your side to get into this air space?
"[BUTLER]: No, sir. I didn't drill into that. I actually took the baseboard up.
"[PROSECUTOR]: Okay. You took the baseboard off?
"[BUTLER]: Yes, sir.
"[PROSECUTOR]: And once you took the baseboard off 
"[BUTLER]: You could see the other side of the wall. And that's when I could see the air space that I needed to set the microphone up at that point.
"....
"[PROSECUTOR]: Tell the jury what kind of  what the microphone looked like and what the equipment looked like.
"[BUTLER]: Well, this really would have been very small. No larger than the first joint or maybe half as large as the first joint on your finger. And on the end of it would be a very, very small opening which would be where the sound would go in to pick it up. It was encased in a hard rubber type of casing. So if you picked it up you really wouldn't know what it was. And then, coming off of the back side of that would be two small wires that you attach to another piece of equipment to actually activate the microphone.
"[PROSECUTOR]: Okay. And then what did you do with the microphone itself?
"[BUTLER]: Well, we put that in where it would be right up against that wall with the area  where we had the opening. And then behind that you would put a piece of insulation or something to hold it in place. Because in between the walls of the house you have air thrashing around which creates a noise. So you need to put something over that to cut down on the noise factor. So that's what I did.
"[PROSECUTOR]: Okay. And then once the microphone  the microphone would have been touching the air space of Blanton's kitchen?
"[BUTLER]: Well, it would be  the wall would be here and it would be on the back side of the wall where you could  right up against it."
(R. 1450-55) (emphasis added).
During the defense's cross-examination of Butler, the following occurred:
"[DEFENSE COUNSEL]: So did you take the listening device and put it up against Mr. Blanton's wall?
"[BUTLER]: Yes. On our side of the wall, yes. From our side of the wall.
"[DEFENSE COUNSEL]: From your side of the wall?
"[BUTLER]: Yes.
"[DEFENSE COUNSEL]: But it was placed on to Mr. Blanton's wall?
"[BUTLER]: That's right.
"[DEFENSE COUNSEL]: And did you tape it on there, tack it on there, glue it on there?
"[BUTLER]: It had some insulation on it that would hold it in place.
"[DEFENSE COUNSEL]: Okay. So you put some insulation around it which would hold it up against that wall?

*861 "[BUTLER]: That's right.
"[DEFENSE COUNSEL]: Okay. And then did I hear you when you said there was a hole in the wall already?
"[BUTLER]: Yes. You could see the light on the other side.
"[DEFENSE COUNSEL]: Okay. So you put it up against that hole?
"[BUTLER]: Yes."
(R. 1465-66.) Butler further testified that he used a telephone line he had had installed in Colvin's apartment to transmit what the equipment recorded to another location.

A.
First, the appellant contends that the admission of the recording violated his Fourth Amendment rights. The parties have ultimately agreed[1] that the standard to be applied in determining whether the recording should have been admitted is the trespass standard that was in effect in 1964[2] when the recording was made.[3]
Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), addressed the trespass standard, and its facts are quite similar to the facts of this case.
"The petitioners were lawyers. One of them, Martin Goldman, approached Hoffman, the attorney representing an assignee for the benefit of creditors, with the proposition that the assignee sell the assets in bulk for an ostensible price which would net the creditors a certain dividend, but in fact at a secret greater price, and that Hoffman and the petitioners should divide the difference between them. Hoffman refused. Shulman, one of the petitioners, then filed an involuntary petition in bankruptcy against the assignor, in such form that it could be dismissed on motion and without notice, and obtained a stay of the assignee's sale. The bankruptcy court refused to revoke the stay, and Shulman again approached Hoffman stating that, if he agreed to the proposed arrangement, the bankruptcy petition could be dismissed and the plan consummated. Hoffman said he would agree, but he went at once to the referee and disclosed the scheme. A federal investigator was consulted and it was arranged that Hoffman should continue to negotiate with the petitioners. He did so. Numerous conferences were had and the necessary papers drawn and steps taken. Success was frustrated only by the refusal of a *862 creditor to release for the offered percentage of his claim.
"Meantime, two federal agents, with the assistance of the building superintendent, obtained access at night to Shulman's office and to the adjoining one and installed a listening apparatus in a small aperture in the partition wall with a wire to be attached to earphones extending into the adjoining office. This was for the purpose of overhearing a conference with Hoffman, set for the following afternoon. The next afternoon, one of the agents returned to the adjoining room with two others and a stenographer. They connected the earphones to the apparatus but it would not work. They had with them another device, a detectaphone, having a receiver so delicate as, when placed against the partition wall, to pick up sound waves originating in Shulman's office, and means for amplifying and hearing them. With this the agents overheard, and the stenographer transcribed, portions of conversations between Hoffman, Shulman, and Martin Goldman on several occasions, and also heard what Shulman said when talking over the telephone from his office."
316 U.S. at 130-32, 62 S.Ct. at 994. Shulman moved to suppress the evidence the agents obtained, arguing that they obtained it in violation of the Fourth Amendment. The Supreme Court rejected the argument, stating:
"3. We hold that what was heard by the use of the detectaphone was not made illegal by trespass or unlawful entry.
"The petitioners contend that the trespass committed in Shulman's office when the listening apparatus was there installed, and what was learned as the result of that trespass, was of some assistance on the following day in locating the receiver of the detectaphone in the adjoining office, and this connection between the trespass and the listening resulted in a violation of the Fourth Amendment. Whatever trespass was committed was connected with the installation of the listening apparatus. As respects it, the trespass might be said to be continuing and, if the apparatus had been used it might, with reason, be claimed that the continuing trespass was the concomitant of its use. On the other hand, the relation between the trespass and the use of the detectaphone was that of antecedent and consequent. Both courts below have found that the trespass did not aid materially in the use of the detectaphone. Since we accept these concurrent findings, we need not consider a contention based on a denial of their verity.
"4. We hold that the use of the detectaphone by Government agents was not a violation of the Fourth Amendment."
316 U.S. at 134-35, 62 S.Ct. at 996.
In On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), the Supreme Court again addressed the trespass standard and further explained its decision in Goldman as follows:
"Petitioner, On Lee, had a laundry in Hoboken. A customer's room opened on the street, back of it was a room for ironing tables, and in the rear were his living quarters. Chin Poy, an old acquaintance and former employee, sauntered in and, while customers came and went, engaged the accused in conversation in the course of which petitioner made incriminating statements. He did not know that Chin Poy was what the Government calls `an undercover agent' and what petitioner calls a `stool pigeon' for the Bureau of Narcotics. Neither did he know that Chin Poy was wired *863 for sound, with a small microphone in his inside overcoat pocket and a small antenna running along his arm. Unbeknownst to petitioner, an agent of the Narcotics Bureau named Lawrence Lee had stationed himself outside with a receiving set properly tuned to pick up any sounds the Chin Poy microphone transmitted. Through the large front window Chin Poy could be seen and through the receiving set his conversation, in Chinese, with petitioner could be heard by agent Lee. A few days later, on the sidewalks of New York, another conversation took place between the two, and damaging admissions were again `audited' by agent Lee.
"....
"Petitioner contends that this evidence should have been excluded because the manner in which it was obtained violates ... the search-and-seizure provisions of the Fourth Amendment....
"The conduct of Chin Poy and agent Lee did not amount to an unlawful search and seizure such as is proscribed by the Fourth Amendment. In Goldman v. United States, 316 U.S. 129[, 62 S.Ct. 993, 86 L.Ed. 1322], we held that the action of federal agents in placing a detectaphone on the outer wall of defendant's hotel room, and thereby overhearing conversations held within the room, did not violate the Fourth Amendment. There the agents had earlier committed a trespass in order to install a listening device within the room itself. Since the device failed to work, the Court expressly reserved decision as to the effect on the search-and-seizure question of a trespass in that situation. Petitioner in the instant case has seized upon that dictum, apparently on the assumption that the presence of a radio set would automatically bring him within the reservation if he can show a trespass.
"But petitioner cannot raise the undecided question, for here no trespass was committed. Chin Poy entered a place of business with the consent, if not by the implied invitation, of the petitioner. Petitioner contends, however, that Chin Poy's subsequent `unlawful conduct' vitiated the consent and rendered his entry a trespass ab initio.

"If we were to consider that Chin Poy's conduct was unlawful and consider this argument as an original proposition, it is doubtful that the niceties of tort law initiated almost two and a half centuries ago by the case of the Six Carpenters, 8 Coke 146(a), cited by petitioner, are of much aid in determining rights under the Fourth Amendment. But petitioner's argument comes a quarter of a century too late: this contention was decided adversely to him in McGuire v. United States, 273 U.S. 95, 98, 100, [47 S.Ct. 259, 260, 261, 71 L.Ed. 556 (1927),] where Mr. Justice Stone, speaking for a unanimous Court, said of the doctrine of trespass ab initio: `This fiction, obviously invoked in support of a policy of penalizing the unauthorized acts of those who had entered under authority of law, has only been applied as a rule of liability in civil actions against them. Its extension is not favored.' He concluded that the Court would not resort to `a fiction whose origin, history, and purpose do not justify its application where the right of the government to make use of evidence is involved.' This was followed in Zap v. United States, 328 U.S. 624, 629, 66 S.Ct. 1277, 1279-80, 90 L.Ed. 1477 (1946)].
"By the same token, the claim that Chin Poy's entrance was a trespass because consent to his entry was obtained by fraud must be rejected. Whether an *864 entry such as this, without any affirmative misrepresentation, would be a trespass under orthodox tort law is not at all clear. See Prosser on Torts, § 18. But the rationale of the McGuire case rejects such fine-spun doctrines for exclusion of evidence. The further contention of petitioner that agent Lee, outside the laundry, was a trespasser because by these aids he overheard what went on inside verges on the frivolous. Only in the case of physical entry, either by force,... by unwilling submission to authority, ... or without any express or implied consent ... would the problem left undecided in the Goldman case be before the Court.
"Petitioner relies on cases relating to the more common and clearly distinguishable problems raised where tangible property is unlawfully seized.... But such decisions are inapposite in the field of mechanical or electronic devices designed to overhear or intercept conversation, at least where access to the listening post was not obtained by illegal methods."
343 U.S. at 749-53, 72 S.Ct. at 969-72 (footnotes omitted).
Subsequently, the Supreme Court addressed a situation in which a trespass had occurred in Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), as follows:
"The record shows that in the spring of 1958 the District of Columbia police had reason to suspect that the premises at 408 21st Street, N.W., in Washington, were being used as the headquarters of a gambling operation. They gained permission from the owner of the vacant adjoining row house to use it as an observation post. From this vantage point for a period of at least three consecutive days in April 1958, the officers employed a so-called `spike mike' to listen to what was going on within the four walls of the house next door.
"The instrument in question was a microphone with a spike about a foot long attached to it, together with an amplifier, a power pack, and earphones. The officers inserted the spike under a baseboard in a second-floor room of the vacant house and into a crevice extending several inches into the party wall, until the spike hit something solid `that acted as a very good sounding board.' The record clearly indicates that the spike made contact with a heating duct serving the house occupied by the petitioners, thus converting their entire heating system into a conductor of sound....
"... [A] fair reading of the record in this case shows that the eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied by the petitioners....
"Eavesdropping accomplished by means of such a physical intrusion is beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other electronic means did not amount to an invasion of Fourth Amendment rights. In Goldman v. United States, supra, the Court held that placing a detectaphone against an office wall in order to listen to conversations taking place in the office next door did not violate the Amendment. In On Lee v. United States, supra, a federal agent, who was acquainted with the petitioner, entered the petitioner's laundry and engaged him in an incriminating conversation. The agent had a microphone concealed upon his person. Another agent, stationed outside with a radio receiving set, was tuned in on the conversation, and at the petitioner's subsequent trial *865 related what he had heard. These circumstances were held not to constitute a violation of the petitioner's Fourth Amendment rights.
"But in both Goldman and On Lee the Court took pains explicitly to point out that the eavesdropping had not been accomplished by means of an unauthorized physical encroachment within a constitutionally protected area....
"The absence of a physical invasion of the petitioner's premises was also a vital factor in the Court's decision in Olmstead v. United States, 277 U.S. 438[, 48 S.Ct. 564, 72 L.Ed. 944 (1928)]. In holding that the wiretapping there did not violate the Fourth Amendment, the Court noted that `[t]he insertions were made without trespass upon any property of the defendants. They were made in the basement of the large office building. The taps from house lines were made in the streets near the houses.' 277 U.S., at 457[, 48 S.Ct. at 565.] `There was no entry of the houses or offices of the defendants.' 277 U.S., at 464[, 48 S.Ct. at 568]. Relying upon these circumstances, the Court reasoned that `[t]he intervening wires are not part of [the defendant's] house or office any more than are the highways along which they are stretched.' 277 U.S., at 465[, 48 S.Ct. at 568].
"Here, by contrast, the officers overheard the petitioners' conversations only by usurping part of the petitioners' house or office  a heating system which was an integral part of the premises occupied by the petitioners, a usurpation that was effected without their knowledge and without their consent....
"... This Court has never held that a federal officer may without warrant and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard."
365 U.S. at 506-12, 81 S.Ct. at 680-83 (footnotes omitted).
Butler's testimony clearly indicates that there was not a physical penetration into the appellant's kitchen. When he removed the baseboard, he found that there was a pre-existing hole in the wall. However, he placed the microphone against the wall rather than inserting it through the hole into the appellant's kitchen. Although the hole apparently facilitated the listening process, Butler testified that he did not create or enlarge the hole or otherwise penetrate the wall with the microphone or any attaching apparatus. This situation is more analogous to Goldman than Silverman. Therefore, we conclude that Butler's acts did not constitute a trespass and that the admission of the recording did not violate the Fourth Amendment.

B.
Second, the appellant contends that the trial court should not have allowed the jury to read a transcript of the recording while it listened to the recording. Specifically, he asserts that, because the transcript "is the government's interpretation of what it heard" and because "the transcript was edited numerous times by various persons," it may have misled the jurors and prevented them from drawing their own conclusions as to the content of the recording. (Appellant's brief at p. 65.)
The prosecution indicated that it wanted to submit the transcript to the jury as an aid only while it listened to the recording and that it was not offering it as an exhibit that would go into the jury room. The trial court agreed that such an approach was permissible and explained to the jury as follows:

*866 "[L]adies and gentlemen, what I'm saying is that the transcript that you will be given is not in evidence. But you will be allowed to use that to review the tape as you listen to it. You will not have that any further, but you will have that just to aid you in listening to the tape. But what you're to consider as the evidence in this case is what you hear from that tape."
(R. 1493.) Subsequently, after the recording was played for the jury, the jurors' copies of the transcript were taken up immediately. "Consequently, the transcript was properly [used] for the limited purposes advanced by the prosecution." Jackson v. State, 594 So.2d 1289, 1297 (Ala.Crim.App.1991).

III.
The appellant's third argument is that the trial court should not have admitted James Lay's testimony. Lay was not able to testify at trial due to a health condition. Therefore, the trial court allowed a witness to read into evidence Lay's testimony from May 2000.
Lay testified that he had been a volunteer civil defense worker in 1963, that his group had tried to keep peace in Birmingham, and that he had gone by the Sixteenth Street Baptist Church on many occasions during that time. Approximately two weeks before the bombing, he rode by the church around 1 a.m. and saw a black 1957 Ford vehicle parked near the side steps to the church. He saw three or four people, two or three of whom were in the parked vehicle and one of whom was almost under the steps holding a bag. He testified that that man and at least one of the other men were white. When Lay turned on his vehicle's bright lights, the man who had been near the steps walked quickly toward the parked vehicle and got into it, and the vehicle drove away quickly. Finally, Lay testified that, after looking at photographs, he concluded that the appellant resembled the person he had seen outside of the vehicle.
Immediately thereafter, the defense introduced evidence that Lay had given numerous statements about the incident and the bombing to various law enforcement authorities; that some of those statements were not consistent with his May 2000 testimony; and that he either had not given or had given differing descriptions of the men he had observed near the church. It also introduced evidence from Lay's military records from 1951 that showed that he suffered from emotional instability; that he had received shock treatments for his mental condition; that he had been diagnosed as having dramatic behavior and suicidal tendencies; that he was considered a serious management problem; and that he had characteristics of suspiciousness, stubbornness, passive obstructionism, excitability, and undependable judgment.

A.
First, the appellant contends that Lay's testimony was irrelevant and immaterial to the issues in the case. Although he presented these arguments in a motion in limine, he did not obtain an adverse ruling on that motion. Rather, the trial court indicated that it would rule on the motion later during the trial. Subsequently, when the State introduced Lay's testimony into evidence, he did not object to the admission of the testimony.[4] We addressed *867 a similar situation in Krumm v. City of Robertsdale, 648 So.2d 651, 653 (Ala.Crim.App.1994), as follows:
"The appellant also contends that the trial court erred by denying his motion in limine regarding the receipt into evidence of proof of some prior felony convictions.
"In this case, the record reveals that the appellant made a motion in limine before the trial began, seeking to exclude any evidence or testimony regarding the appellant's prior criminal record. The trial court addressed the appellant's motion in limine, stating:
"`Well, I'm going to withhold ruling on that [until] we get to it. You bring it back up at the proper time.'
"The appellant never renewed his motion; consequently, there was no ruling on the motion in limine. No objection was made at the time the evidence of these convictions was proffered at trial. Thus, this issue has not been preserved for appellate review. `Review on appeal is limited to matters as to which the trial court makes adverse rulings.' Landreth v. State, 600 So.2d 440, 445 (Ala.Cr.App.1992), citing Donahoo v. State, 552 So.2d 887 (Ala.Cr.App.1989); Jackson v. State, 484 So.2d 1174 (Ala.Cr.App.1985)."
Because he does not have an adverse ruling from which to appeal, the appellant's arguments are not properly before this court.
Moreover, Rule 401, Ala. R. Evid., provides:
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
Lay's testimony was relevant because he saw a person who resembled the appellant holding a bag near the steps where the bomb exploded during the early morning hours approximately two weeks before the explosion. Therefore, the appellant's argument is without merit.

B.
Second, the appellant contends that Lay's testimony was not reliable and that Lay had given inconsistent statements about his observations. However, he did not first present these specific grounds of objection to the trial court.[5] "`The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.' Ex parte Frith, 526 So.2d 880, 882 (Ala.1987)." Miller v. State, 602 So.2d 488, 496 (Ala.Crim.App.1992). Therefore, the appellant's arguments are not properly before this court.
Moreover, the defense immediately presented evidence about Lay's many statements and his mental condition. Therefore, the jury was properly allowed to determine what weight, if any, to give to Lay's testimony.

IV.
The appellant's fourth argument is that the trial court should have suppressed audiotapes of conversations between him and Mitchell Burns and should not have allowed the jury to follow along with transcripts of those audiotapes while they were *868 being played for the jury.[6] Mitchell Burns testified that, in 1964 and 1965, he was an informant for the FBI, he befriended the appellant, and he and the appellant rode around in his vehicle, which had been equipped with recording equipment. He also testified that he and the appellant drove by the Sixteenth Street Baptist Church approximately one to three times a week during that time. At trial, the prosecution played several audiotapes of conversations between Burns and the appellant, and the jurors were allowed to follow along with transcripts of the audiotapes. During those conversations, the appellant made references to the fact that he liked to go bombing; talked about what he would do when he bombed his next church and noted that it was not easy to do; made several references to dynamite; talked about Jewish synagogues being so well built that they did not want to be dynamited; talked about bombing the building where the FBI's Birmingham office was located; made several references to church bombing; noted that "we made the bomb over here"; and referred to bombing a church and goofing it up again.

A.
First, the appellant contends that the trial court should not have admitted the audiotapes because they allegedly
"were inaudible, muffled, confusing, incomprehensible, do not accurately reflect the entire conversations between the parties, and are otherwise of poor quality. The inaudible portions of the tapes, and/or the omissions, are so substantial that they render the recordings, as a whole, untrustworthy."
(Appellant's brief at p. 70.) We have listened to the audiotapes, and we agree that parts of some of the tapes are not audible. Contrary to the appellant's argument, taken in context, those inaudible parts were not so substantial that they render the audiotapes untrustworthy. Rather, they are primarily small portions of conversations that do not appear to affect the accuracy of the substance of the conversations or otherwise detract from the purpose for which the audiotapes were admitted. "The quality of the tape[s] was a factor for the jury's consideration in determining the weight to be given the evidence, rather than a factor concerning its admissibility." Davis v. State, 529 So.2d 1070, 1072 (Ala.Crim.App.1988). Therefore, the trial court did not err in admitting the audiotapes into evidence.

B.
Second, the appellant contends that the trial court should not have allowed the use of transcripts of the audiotapes because
"[i]t is very likely that the jury was allowed to speculate as to the inaudible and confusing portions of the recordings and sought guidance from the government's written interpretation of the tapes."
(Appellant's brief at p. 70.) We have carefully listened to the audiotapes and compared them to the transcripts the jury used, and there are places where the transcripts appear to be slightly different from the audiotapes. "They are, however, minor in nature and served to only cast slight doubt upon the weight which should be given the recording[s] by the jury." Hammond v. State, 354 So.2d 280, 293 (Ala.Crim.App.1977). Further, the trial court gave the jury the following instructions regarding the use of the transcripts:

*869 "Ladies and gentlemen, yesterday, I guess it was yesterday, you heard a tape  it was yesterday. You heard a tape and also had a transcript that had been prepared purporting to be the contents of that tape. I told you that you were to consider what you heard on that tape as being the evidence. And likewise today, you will be provided a transcript of it. There's been a charge to the jury as to how this matter is to be considered. The tape numbers are several different tape numbers. And I think they are Exhibit Numbers 72-A up through 92, a couple of those are not in there. 74 and 75 and 84 are not in there. So there are about fifteen 
"....
"... Fifteen tapes that you are to consider. The transcript purporting to be the conversation contained on that tape is there  it will be provided for you. And this typewritten transcript of these conversations, as I said, purports to be these speakers engaged in a conversation. The allowance of this transcript for your use is for a limited purpose and the secondary purpose of aiding you in following the [content] of the conversations as you listen to the tape. And also, to ... aid you in identifying the speakers. However, you are specifically instructed as to whether the transcript correctly or incorrectly reflects the content of the conversations or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony that you hear concerning  that you have heard concerning the preparation of the transcript. And from your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of its contents. And if you should determine that the transcript is in any way in any respect incorrect or unreliable, then you disregard that part of the transcript as to that extent. That is a legalized charge to the jury.
"The way I'm going to put it to you is this. Ladies and gentlemen, you are to determine as to what the content of those tapes are. And you're to determine that from listening to the tapes. The transcript is merely to aid you as to possibly the contents of the tape and as to the speakers. But you are the ultimate arbitrator of the facts in this case and you're to make the determination as to the contents of those tapes based on your listening to the tapes and hearing them as they come over the speakers that you will have for your consideration."
(R. 1597-99.) Accordingly, the trial court did not err in allowing the jury to follow along with transcripts of the audiotapes.

V.
The appellant's fifth argument is that the trial court erroneously denied defense counsel's repeated requests for a continuance. Specifically, he contends that, because the attorney who represented him at trial was appointed only 66 days before the trial started, counsel could not adequately prepare his case for trial.
The appellant was indicted on May 16, 2000. The record indicates that he was represented by David Luker at least as early as May 22, 2000. On February 9, 2001, the trial court allowed Luker to withdraw as counsel for the appellant and appointed John Robbins to represent him. On March 9, 2001, defense counsel filed a motion to continue based on the short time he had represented the appellant and the large number of documents involved in the case. However, in his motion, counsel asserted, in part:

*870 "[C]ounsel has acted diligently in preparing this case for trial. He has met with the Defendant on a daily basis and has expended approximately four hours per day on this case, in addition to the time he has spent meeting with the Defendant. Counsel has assembled a defense team consisting of two additional attorneys, a private investigator and a paralegal....
"....
"... [T]he Defendant has played no role in undermining preparation of this case. To the contrary, the Defendant has been present during case preparation and offered time and assistance to counsel."
(C.R.203-05.) During a motion hearing on March 23, 2001, the trial court stated:
"As far as a motion to continue, at this time I don't see that there has been sufficient ground shown for a motion for continuance. So I'm going to deny it at this time. If something else comes forward which would cause the Court to grant that, then I would consider it at that time. But at this time I'll deny the motion for a continuance and the matter will proceed to trial on April the 16th unless the Court further feels that for good grounds it should be granted."
(3/23/01 Hearing at 5.) On April 12, 2001, defense counsel filed a second motion to continue based on the fact that the State had just produced new information and the fact that the defense was attempting to locate possible defense witnesses that were developed after a review of the discovery the State had provided. On April 16, 2001, the trial proceedings started, and the trial court denied the appellant's second motion to continue. Finally, after the voir dire proceedings, defense counsel renewed the motion for a continuance, and the trial court stated:
"I'll say this. I haven't seen a case prepared as well as this one in a long time.... I know you always feel like you'd like to have a little bit more time, but based on what I have seen, you have been well prepared. So I'll overrule that at this time, too."
(R. 839.)
"`In Ex parte Saranthus, 501 So.2d 1256 (Ala.1986), the Alabama Supreme Court addressed the issue of a pretrial continuance:
"`"A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973)...."
"`Saranthus, 501 So.2d at 1257. "`There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964)." Glass v. State, 557 So.2d 845, 848 (Ala.Cr.App.1990).
"`"The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires `a positive demonstration of abuse of judicial discretion.' Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969)." Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala.1979). A "positive demonstration of abuse of judicial discretion" is required even where the refusal to grant the continuance is "somewhat harsh" and this Court does not "condone like conduct in future *871 similar circumstances." Hays v. State, 518 So.2d 749, 759 (Ala.Cr.App.1985), affirmed in part, reversed on other grounds, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). See also Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App.1984) (no abuse of discretion found although court did not "approve of the manner in which this case was handled").'
"McGlown v. State, 598 So.2d 1027, 1028-29 (Ala.Cr.App.1992)."
Dozier v. State, 630 So.2d 137, 139 (Ala.Crim.App.1993).
The appellant argues that his counsel did not have adequate time to prepare for the trial and that therefore his right to counsel was violated. However, he has not cited any specific instances in which he contends that counsel's performance was deficient, and he has not contended that any such deficiencies prejudiced him. In fact, the record belies his argument. As the trial court noted, defense counsel was clearly very well prepared for the trial, and he fully and thoroughly cross-examined the State's witnesses and presented witnesses and evidence on behalf of the appellant. Therefore, the appellant has not positively demonstrated that the trial court abused its discretion in denying his requests for a continuance.

VI.
The appellant's sixth argument is that the trial court erroneously denied his motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), after the State used all of its peremptory strikes to remove white veniremembers. After the jury was struck, but before it was sworn, the defense made a Batson motion, and the trial court required the State to give its reasons for exercising its peremptory strikes.
The State indicated that it struck veniremember B.F. Q# 29, whom it had previously challenged for cause, based on his "very strong opinions against the use of any kind of wiretaps or electronic surveillance," his strong feelings about racial issues, and the fact that he did not believe in race mixing. (R. 778.)
The State indicated that it struck veniremember T.R. Q# 42, whom it had previously challenged for cause, because he "very strongly question[ed] new evidence after this length of time," he "had a negative opinion about even prosecuting the case after the length of this time," he "question[ed] whether or not tapes were altered," and he "said somebody could have easily altered those tapes." (R. 780.)
The State indicated that it struck veniremember C.P. Q# 48 because his answers during the voir dire proceedings appeared to indicate "underlying racist attitudes"; "he seemed flippant" and "was gum-chewing"; was coy about some of his answers during the voir dire examination; and did not pay attention in school, thus implying that "he's not going to study this evidence." (R. 785, 787.)
The State indicated that it struck veniremember J.S. Q# 91 because he was "concerned about his work" and probably would not "give full attention to this case"; if he served on the jury, he would miss a test that he had to take to maintain a license for his job; he grew up in a "very anti-integration, segregationist household"; and he was spending time with other young white males the State struck. (R. 789.)
The State indicated that it struck veniremember S.S. Q# 59 because he
"immediately questioned the State's evidence based on his review, obviously, from the media. This guy threw out legal terms, even though he's not a lawyer. *872 He would be concerned with chain of custody issues. He would be concerned with authenticity issues. He questioned the State in ways in which he is not a lawyer. Circumstantial issues, I think, would be a main problem for him.
"Moreover, Judge, this guy, even though he hadn't talked to him in a while, this man was in the military with Bill Clark who is not only a prominent defense lawyer who he talked law with, but in most recent months Mr. Clark was one of the lead defense counsels on a high profile case in this county involving the sheriff that personally attacked me and my office. And the way this guy reads the newspaper, I would have a real problem with anyone who was selected...."
(R. 794-95.)
The State indicated that it struck veniremember M.M. Q# 85, whom it had previously challenged for cause, because she "very clearly indicated that she would hold the prosecution to a high burden," and because she was not able to understand the trial court's instructions. (R. 796.)
The State indicated that it struck veniremember W.N. Q# 93 because his great-grandfather was a Klansman; he appeared to be "out of the main stream" and "a part of new age"; and he had a degree in psychology, "which we also felt like was not appropriate for this jury." (R. 798.)
The State indicated that it struck veniremember G.B. Q# 28 because she indicated that she would hold the State to a high burden of proof; was "very coy about her answers to [questions about] the K.K.K."; appeared to have racist attitudes; indicated that she would have a problem looking at photographs of the children; appeared to be immature; and was overheard telling another veniremember "I just don't see what they have or they would really have to show me something...." (R. 799-800.)
The State indicated that it struck veniremember M.A. Q# 88 because,
"going back to questions on how she feels about racial issues, she says she hears way too much about it, especially in February. She's the only juror on this panel to express an opinion one way or another about Black History Month being the month of February. Said she gets tired of hearing about [Black History Month] all the time."
(R. 802.)
The State indicated that it struck veniremember C.J. Q# 86 because his grandfather was a Birmingham police officer who worked for Bull Connor and because
"we believe that he misrepresented himself to the Court concerning informant tapes. He is the one that said ... [he] had not read or heard anything about the case, but he did recall something about informant tapes. Which I think even [defense counsel] commented after he left the room that he had to be not telling the truth because that could have only come after the jury had been seated the day before."
(R. 805.) Afterward, defense counsel stated, "I will concede that he is correct on his assessment of C.J. Q# 86's veracity on that issue." (R. 805-06.)
The State indicated that it struck veniremember A.H. Q# 53 because she "voiced strong opinions against any use of wiretaps or electronic bugs"; she was "[v]ery opposed to any kind of mixed marriages"; her demeanor was "very giggly" and "[v]ery flippant"; and she appeared to have a "deep seeded feeling" about Martin Luther King Jr.'s birthday being a national holiday. (R. 806, 808.)
The State indicated that it struck veniremember P.P. Q# 49 because she was a court employee; she had assisted a bailiff *873 with some of the veniremembers who had been excused; she "would be very outspoken" and probably would not change her mind; and she was spending time with young veniremembers the State had struck. The defense did not state any concerns about the State's reasons for striking veniremember P.P.
The State indicated that it struck veniremember Y.S. Q# 60[7] because he had written a paper on the Ku Klux Klan, but was "cagey about what he actually wrote"; did not seem to remember anything about Klan violence; and strongly disagreed with school integration. (R. 813.)
The State indicated that it struck veniremember T.L. Q# 41, an alternate, because
"[w]e see him as extremely analytical.
"Also saw him as basically detached, living with his own circle of friends with his church and his family. We didn't think that he would give the State a fair shake in analyzing what is generally a circumstantial evidence case."
(R. 816.) It also described him as "very stiff" and "[v]ery cold." (R. 832.)
The State indicated that it struck veniremember R.G. Q# 76, an alternate, because he was twenty-three years old; he "[s]aid he just can't correct something that happened thirty years ago"; he was "a little bit more laid back" and "[w]anted to play his drums rather than giv[e] serious consideration to this case"; and his uncle was a bailiff who had openly expressed hostility toward the case. (R. 819.)[8]

A.
The appellant contends that the State's reasons for its strikes were not race-neutral.
"In Batson the United States Supreme Court held that black veniremembers could not be struck from a black defendant's jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance, Co., 617 So.2d 657 (Ala.1993)."
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
"After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike.... See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991). We will reverse the circuit court's ruling on the Batson motion only if it is `clearly erroneous.' Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989)."
Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992).
*874 The State struck most of the veniremembers for reasons that related to the facts of the case  opposition to the use of wiretap or electronic surveillance, racist feelings and/or attitudes, questioning the new evidence, questioning the delay in prosecution, having a family member who worked for Bull Connor, having a family member who had openly expressed hostility toward the case, having a problem looking at photographs, and possibly questioning circumstantial evidence. "For a prosecutor's reasons to be race-neutral, they must be related to the facts of the case. Williams v. State, 548 So.2d 501 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989)." Grider v. State, 600 So.2d 401, 402 (Ala.Crim.App.1992). We conclude that the State's strikes based on reasons that were related to the facts of this case were race-neutral.
We also conclude that the State's other reasons for striking veniremembers were race-neutral. "A valid race-neutral reason for striking a juror is because he is inattentive, hostile, or impatient, or is evasive and ambiguous when answering questions." Brown v. State, 623 So.2d 416, 419 (Ala.Crim.App.1993). "The fact that an individual may not be able to keep track of the proceedings because of mental or physical impairment is a valid race-neutral reason for striking that juror." Yelder v. State, 630 So.2d 92, 100 (Ala.Crim.App.1991), rev'd on other grounds, 630 So.2d 107 (Ala.1992). "A veniremember's indication that service on the jury would be a hardship is a valid race-neutral reason for striking that veniremember." Id."Also, the fact that [a veniremember] may have gained information from pretrial publicity related to the facts of the case to be tried is a race-neutral reason for a strike. See Shelton v. State, 521 So.2d 1035 (Ala.Crim.App.1987), cert. denied, 521 So.2d 1038 (Ala.1988)." Sockwell v. State, 675 So.2d 4, 20 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995). Further, the fact that a veniremember would hold the State to a higher burden of proof is a race-neutral reason for striking that veniremember. See Stargell v. State, 672 So.2d 1362 (Ala.Crim.App.1995). The fact that a veniremember has a degree in psychology may be a race-neutral reason for a strike. See Ex parte Brown, 686 So.2d 409 (Ala.1996). Also, the fact that a veniremember gave untruthful answers during the voir dire proceedings is a race-neutral reason for striking that veniremember. See Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000). Finally,
"[d]emeanor, the way in which a person behaves or conducts himself, can include a number of characteristics, such as... a general lack of respect for the proceedings which could be exhibited by such behavior as chewing gum, wearing sunglasses, hats, excessive jewelry, or inappropriate clothing while inside the courtroom."
Stephens v. State, 580 So.2d 11, 19 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991).
For these reasons, we conclude that the trial court properly found that the State's reasons for exercising its peremptory strikes were race-neutral.

B.
The appellant also contends that the State's reasons for its strikes were pretextual.

1.
First, the appellant asserts that the State engaged in disparate treatment because it struck veniremembers B.F. Q# 19 and A.H. Q# 53 because of their opposition to wiretap evidence, but it did not strike veniremember B.M. Q # 43, a *875 black female, who expressed opposition to wiretap evidence. During the voir dire proceedings, veniremember B.M. stated that she felt like wiretaps were an invasion of a person's privacy. However, she also stated that she could set aside her feelings and follow the trial court's instructions if wiretap evidence was admitted during the trial. Oppositely, veniremember B.F. Q# 19 indicated that he would only consider wiretap evidence if the person against whom it was used had a previous criminal record. Veniremember A.H. Q # 53 also indicated that she did not like the idea of someone listening in on her conversations. Although she did not state that she could set aside her feelings, she did state that she would listen to any recordings and be fair. In addition to their feelings about wiretap evidence, the State also indicated that it struck veniremembers B.F. and A.H. based on their racist attitudes. Veniremember B.M. did not display such racist attitudes. As set forth above, the State's concerns about opposition to wiretap evidence and racist attitudes were race-neutral. Accordingly, we do not find that there was any disparate treatment in this regard.

2.
Second, the appellant asserts that the State engaged in disparate treatment because it allegedly stated that it struck all of the veniremembers who were under the age of thirty, but it did not strike veniremember J.P. Q # 45, a black female who was under the age of thirty. While the State was giving its reasons for its strikes, one of the prosecutors said, "I think, Judge, we also ended up striking all the jurors who were under thirty years except for one lady who was pregnant." (R. 786.) When read in context, the prosecutor was not stating that the State intentionally struck all veniremembers who were under the age of thirty. In fact, the State gave age as a reason with regard to only one strike. Rather, it appears that the comment was simply an after-the-fact observation that the result of its striking had been to remove all but one of the veniremembers who were under the age of thirty. Therefore, we do not find that there was any disparate treatment in this regard.

3.
Third, the appellant asserts that the State engaged in disparate treatment because it struck veniremember M.M. Q# 85, a white female, because she could not understand the trial court's instructions, but it did not strike veniremember J.J. Q# 31, a black male, who he contends was illiterate. During the voir dire proceedings, veniremember M.M. "very clearly indicated that she would hold the prosecution to a high burden." (R. 796.) The trial court repeatedly attempted to explain the State's burden of proof to her, but she did not appear to understand the trial court's instructions. Oppositely, although veniremember J.J. did have assistance in filling out his questionnaire, he indicated during the voir dire proceedings that he had been passed to the seventh grade in school, that he could not read well, that he could write a little, that he could sign his name, that someone could go over written information with him if necessary during the trial, and that he could work around that situation. Although he did not read well, veniremember J.J. indicated that he could adjust to the situation if it became necessary for someone to go over written information with him during the trial. Also, he could speak and understand the English language and appeared to be able to follow instructions given by the trial court. Therefore, veniremembers M.M. and J.J. were not similarly situated, and *876 we do not find that there was any disparate treatment in this regard.

VII.
The appellant's seventh argument is that the trial court improperly instructed the jury on conspiracy. The record before us does not include a transcript of the charge conference. After the trial court's oral charge, but before the jury retired to consider its verdict, the defense indicated that it had "one exception." (R. 1897.) However, the exception does not appear in the record before this court and was apparently raised during an off-the-record sidebar discussion. (R. 1897.) Subsequently, after the jury had retired to consider its verdict, the defense objected to the instruction on conspiracy.
"No party may assign as error the court's giving ... of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
Rule 21.3, Ala. R.Crim. P. (emphasis added). Therefore, it does not appear that the appellant properly preserved this argument for appellate review.[9]
Moreover, we have reviewed the challenged instruction, and we find that it was appropriate under the facts of this case. Although the trial court used the term conspiracy, it was clearly instructing the jury on the concept of accomplice liability. The evidence presented during the trial supported such an instruction. Therefore, the appellant's argument is without merit.

VIII.
The appellant's eighth argument is that the trial court erred in denying his motion for a change of venue.
"`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).'
"Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994)."
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'" Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
"In connection with pretrial publicity, there are two situations which mandate *877 a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983)."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).

A.
We must first determine whether the pretrial publicity resulted in "presumptive prejudice." For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
"Hunt relies on the `presumed prejudice' standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations'. Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
"Hunt had the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
"....
"... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the *878 grounds of community saturation, `the appellant must show more than the fact "that a case generates even widespread publicity."' Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"`"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."'
"Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
"A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so `pervasively saturated' with prejudicial publicity so as to make the court proceedings nothing more than a `hollow formality.' Rideau, supra."
Hunt, 642 So.2d at 1043-44. "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
In support of his motion for a change of venue, the appellant introduced evidence concerning a telephone poll of 400 Jefferson County citizens  200 white and 200 black  about the case. Of the people responding to the poll, 99.3 percent indicated that they had heard about the bombing. Of those who had heard about the bombing, 28.4 percent indicated that they thought the appellant was guilty, 17.0 percent thought the appellant was probably guilty, 2.0 percent thought the appellant was probably not guilty, and 1.2 percent thought the appellant was not guilty. However, a majority, 51.4 percent, were uncertain as to the appellant's guilt at that time. When the respondents were asked whether they could set aside what they had heard about the case and decide it based solely on the evidence presented in court, a majority, 55.4 percent, indicated that they could set aside what they had heard; 32.7 percent indicated that they could not set aside what they had heard; and 12.0 percent were not certain. The appellant also introduced numerous newspaper articles from local newspapers that covered the case from its inception through the trial.
Although the appellant presented evidence that indicated that many of the citizens of Jefferson County had heard about the bombing through the media, he has not shown that the information presented by the media was prejudicial. We have examined the media materials he presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. Further, the appellant did not prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" *879 that warrant a presumption of prejudice from pretrial publicity.

B.
We must also determine whether the jury was actually prejudiced against the appellant.
"The `actual prejudice' standard is defined as follows:
"`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544."
Hunt, 642 So.2d at 1043.
"Furthermore, in order for a defendant to show prejudice, the '"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
The appellant has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings, the parties individually questioned each veniremember and extensively covered exposure to the media and/or knowledge about the case. Nearly all of the veniremembers had heard, read, or seen or knew something about the case. However, only three indicated that they had already formed opinions about the case based on that information and that they could not be fair, and the trial court excused those veniremembers for cause. The remaining veniremembers indicated that they could set aside any information they had previously obtained about the case and make a decision based solely on the evidence presented during the trial. Accordingly, the appellant has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the appellant did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a change of venue.

IX.
The appellant's ninth argument is that the trial court should have granted his motion to dismiss due to pre-indictment delay.
"The Supreme Court held in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), that a defendant's Sixth Amendment right to a speedy trial applies only to prosecutions formally begun, not to pre-accusation delays. Appellant does not argue a speedy trial violation.
"Since appellant's prosecution is not barred by the statute of limitations, the possible due process violation must be addressed.
"Although Marion, supra, recognized a due process protection separate from the statute of limitations, the due process clause has a limited role against oppressive delay, United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 *880 L.Ed.2d 752 (1977); Chambliss v. State, Ala. Cr.App., 373 So.2d 1185, cert. denied, Ala., 373 So.2d 1211 (1979), and mere passage of time per se is not a constitutional violation. U.S. v. Lovasco, supra, United States v. Doe, 10th Cir., 642 F.2d 1206 (1981). A defendant is charged with a heavier burden of proof in showing a pre-indictment delay due process violation than in showing a denial of his speedy trial rights. The Marion court requires a showing by defendant of actual prejudice, not the mere possibility of prejudice, and that the delay `caused substantial prejudice to appellee's rights to a fair trial.' The proof of actual and substantial prejudice due to the loss of potential witnesses must be `definite and non-speculative.' This actual prejudice must be shown and cannot be presumed. Marion, supra; Chambliss, supra.
"The central question becomes whether appellant met the heavy burden of proof by showing an actual and substantial prejudice resulting from the lengthy delay. We hold that he did not.
"Appellant, in attempting to prove `actual prejudice,' argued that the memories of witnesses had dimmed during the delay. However, in light of the protection afforded by the applicable statute of limitations, diminished recollection alone does not constitute substantial prejudice. Marion, supra.
"More significantly, appellant claimed actual prejudice resulted from the death during the pre-indictment delay of certain potential witnesses, who, he alleges, would have testified in a manner significantly beneficial to his defense. The only `proof' appellant offered in showing actual prejudice was affidavits that he alleged contained what the potential witnesses would have testified to at trial.
"The offered affidavits are simply self-serving assertions which do not prove actual prejudice. The affidavits are bare allegations of what the potential witnesses would have said with no extrinsic support in the record. The nature of such affidavits is much too speculative and non-definite to meet the heavy burden of proof required by Marion. Merely because appellant alleges that certain dead witnesses would testify for him and in a certain manner does not prove that the potential witnesses would testify in such a manner or even testify at all. We cannot accept such self-serving declarations as proof of actual prejudice resulting from the absence of these witnesses, and the affidavits alone do not satisfy the requirements of Marion. ...
"....
"Moreover, even if appellant had proven actual prejudice, the Supreme Court has held that proof of actual prejudice is generally a necessary but not a sufficient element of a due process claim. Proof of actual prejudice is only the first step. If such proof is given, then the focus turns to the reasons for the delay. Lovasco, supra. Marion held that evidence of an intentional delay by the state to gain a tactical advantage would be a due process violation. Lovasco apparently includes evidence of `reckless disregard of circumstances known to the prosecution ...' 431 U.S. at 796, n. 7, 97 S.Ct. at 2048 n. 7.
"....
"In any event, without any proof in the record, we will not assume from the record that the state intentionally delayed to gain a tactical advantage or made a knowingly reckless disregard of appellant's ability to defend himself. Appellant's bare allegations of improper tactical delay on the state's part is insufficient to establish the necessary malevolent *881 purpose. United States v. Medina-Arrellano[Medina-Arellano], 5th Cir., 569 F.2d 349 (1978).
"A calculated delay hurts the prosecution just as much as the defense. Since the prosecution in a criminal case has the burden of proving its case beyond a reasonable doubt ..., dimmed memories, evidence and unavailable witnesses have a special impact on the burden cast upon the prosecution. In light of the presumption of innocence, and the burden of proof, no prosecutor could reasonably believe that a nineteen-year delay in a case would improve the chances of a conviction. Indeed, the state lost the testimony of [several witnesses]. A conviction was gained in the case in spite of the long delay. See Chambliss, supra.
"We find that the pre-accusation delay did not violate due process guarantees."
Stoner v. State, 418 So.2d 171, 179-82 (Ala.Crim.App.1982) (footnote omitted).
In support of his argument, the appellant asserts that "all of the State's witnesses were known and available to the F.B.I. prior to 1970"; that, because of the delay, he has not been able to follow up on other leads and present theories about other people who could have committed the offense; and that, "through changes in the law since 1964, the June 28, 1964 tape recording is now admissible evidence at trial." (Appellant's brief at p. 96.)
The appellant filed a written motion to dismiss based on the pre-indictment delay of nearly 37 years. In that motion, he gave the names and what he asserted would have been the testimony of several potential witnesses who were no longer available. He also attached statements or portions of statements from some of those witnesses and a Birmingham Police Department status report about the investigation. Based on Stoner, those allegations were not sufficient to establish actual and substantial prejudice due to the loss of potential witnesses.
During the hearing on the motion to dismiss, the defense argued that the FBI had sufficient information to prosecute the appellant by 1965. In response, the prosecutor explained that the FBI had been involved in the investigation of the case since the 1960s, but that it did not have enough evidence to prosecute the appellant federally because it did not have any evidence to show that there had been an interstate transportation of explosives. He further explained that, although the State prosecuted Robert Chambliss for the bombing in 1977 and used some information from the FBI, that prosecution was based primarily on information derived through a separate investigation by the State and that the FBI provided limited information at the insistence of the State based on information the State investigation had revealed. Finally, he explained that the FBI did not share most of the information it had with the State until 1997. Therefore, the appellant has not established that the information that was used during the trial was available to the State before 1997.
The defense also argued that it had been prejudiced by the 37 year delay in the prosecution because, if the case had been prosecuted earlier, it could have followed up on other leads and might have presented another theory about the case. However, he asserted that too much time had passed for the defense to follow up on some of the leads and that some of the witnesses had already died. In response, the prosecutor again explained that, because the FBI did not provide information to the State until 1997, the documentation that would have led the defense to those other leads would not have been available to the defense until 1997. Also, Agent *882 William Fleming testified that the FBI reopened the case in 1995; that it subsequently shared its information with the Birmingham Police Department; and that he and others went through thousands of pages of documents, made a list of people to interview, and determined whether those people were alive or dead and where they were located. The prosecutor stated that he had given that information to the defense. Other than speculation, the appellant has not shown that he could have investigated any other leads if the prosecution had been started earlier.
Finally, as we explain in Part II of this opinion, the law concerning the admissibility of the June 28, 1964, recording is the law at the time of the offense rather than the law at the time of the trial. Therefore, contrary to the appellant's argument, with respect to the recording, the State did not benefit from the law at the time of the trial.
The appellant has not presented any evidence to show that he was actually prejudiced by the pre-indictment delay and that the delay was the product of some deliberate action by the State to gain a tactical advantage. Rather, as did the appellant in Stoner, he has simply offered speculation about what potential witnesses might have said and accusations concerning the reasons for the delay. Therefore, we do not find that the pre-indictment delay violated his due process rights.

X.
The appellant's tenth argument is that the trial court improperly admitted testimony about and a photograph of a piece of mortar that was removed from Denise McNair's body.[10] At trial, Christopher McNair, Denise McNair's father, testified that, when he went to the morgue after the bombing and saw Denise's body, "[t]here was a piece of mortar mashed in her head." (R. 1673.) The appellant did not object to that testimony. McNair also identified State's Exhibit # 100 as "the piece [of mortar] that was in her head," and the prosecution subsequently substituted a photograph for the actual piece of mortar. (R. 1674.)
The appellant contends that McNair's testimony and the photograph were not relevant and that their prejudicial effect substantially outweighed their probative value. Initially, we note that his argument about McNair's testimony is not properly before this court because he did not first present it to the trial court. See Zasadil v. City of Montgomery, 594 So.2d 231 (Ala.Crim.App.1991). We also note that it is not entirely clear from the record before us that he objected at trial to the admission of the photograph of the piece of mortar.
Moreover, the testimony and the photograph were relevant to show the cause and manner of Denise McNair's death.[11]See Rule 401, Ala. R. Evid.; Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000). Further, neither the testimony nor the photograph was excessively gory or gruesome. Therefore, their prejudicial effect did not substantially outweigh their probative value. See Rule 403, Ala. R. Evid. *883 Accordingly, the appellant's arguments are without merit.

XI.
The appellant's eleventh argument is that the trial court improperly allowed William Jackson, "an admitted liar," to testify. (Appellant's brief at p. 98.) Specifically, he contends that Jackson's testimony was not trustworthy, was not probative because it did not relate to the actual bombing of the church, and improperly impugned his character. He made a motion in limine to exclude Jackson's testimony about a specific statement, and the trial court subsequently sustained his objection to any testimony about the specific statement. However, the appellant did not timely present to the trial court the specific objections he now raises about Jackson's testimony.[12] Therefore, his arguments are not properly before this court. See Miller, supra.
Moreover, Jackson admitted that he had been dishonest with law enforcement authorities on a number of occasions, and the defense thoroughly cross-examined him about inconsistent statements he had made. Also, the trial court instructed the jury about determining credibility and that it could decide whether or not to believe a particular witness based on the evidence presented at trial. Therefore, Jackson's credibility went to the weight the jury would give his testimony rather than to the admissibility of his testimony.
Further, Jackson testified that he saw the appellant and Robert Chambliss at a sign shop near the church shortly before the bombing and noticed the appellant getting something out of his trunk. This testimony was relevant because it placed the appellant and Chambliss, who was subsequently convicted of first-degree murder as a result of the bombing of the church,[13] near the church shortly before the bombing. See Rule 401, Ala. R. Evid.
Finally, Jackson testified that the appellant had a hateful attitude toward blacks, Jews, and Catholics. This testimony was relevant to prove the appellant's motive for committing the bombing. See Rules 401 and 404(b), Ala. R. Evid.; Stoner, supra; Chambliss, supra.

XII.
The appellant's twelfth argument is that the trial court improperly denied his challenges for cause.

A.
First, the appellant contends that the trial court should have removed veniremember J.J. for cause. Specifically, he asserts that the veniremember was "illiterate, required assistance in completing his questionnaire, and was most likely unable to follow the intricate and lengthy details of this case." (Appellant's brief at p. 100.) Veniremember J.J. did have assistance in filling out his questionnaire. However, during the voir dire proceedings, he indicated that he had been passed to the seventh grade in school, that he could not read well, that he could write a little, that he could sign his name, that someone could go over written information with him if necessary during the trial, and that he could work around that situation. Although he did not read well, veniremember *884 J.J. indicated that he could adjust to the situation if it became necessary for someone to go over written information with him during the trial. Also, he could speak and understand the English language and appeared to be able to follow instructions given by the trial court. See § 12-16-60(a)(2), Ala.Code 1975 (requiring that a prospective juror be able to "read, speak, understand and follow instructions given by a judge in the English language"). See also McBride v. Sheppard, 624 So.2d 1069 (Ala.1993) (holding that a new trial was not warranted on the basis of alleged illiteracy of a juror where the trial court observed the juror read and found that he could read at a level adequate to serve on a jury). Therefore, the trial court did not abuse its discretion in refusing to remove him for cause.

B.
Second, the appellant contends that the trial court should have removed veniremembers T.H. and K.S. for cause because they "were unable to set aside their personal feelings and apply the law to the evidence." (Appellant's brief at p. 101.)
"It is good ground for challenge of a juror by either party:
"....
"(7) That he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict."
§ 12-16-150, Ala.Code 1975.
"The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
"`When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.'
"....
"Furthermore, in order to determine whether the trial judge's exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985)."
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also," `[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.'" McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
"[t]he test for determining whether a strike rises to the level of a challenge for cause is `whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). `Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). `The decision of the trial court "on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion."' Nettles, 435 So.2d at 153."
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
With regard to veniremember T.H., the appellant asserts that she "was in an interracial marriage and stated during voir dire that, due to the race of her husband and his family, she felt pressured to convict [the appellant] and would have difficulty with her family following a `not guilty' or `hung jury' verdict." (Appellant's brief at p. 100.) The record supports *885 the appellant's assertions. Nevertheless, during the voir dire proceedings, veniremember T.H. also stated that she had heard very little about the case; that she had first heard about the case approximately one year earlier; that her husband thought the appellant was guilty and encouraged her to get off of the case; that she would not let her husband's opinions influence her opinion about the case; that she would not think about her husband's or his family's opinions if she sat on the jury; that she would say the appellant was innocent if she thought he was innocent; that she had not formed an opinion about whether the appellant was guilty; and that she could be fair to both sides. Based on her responses during the voir dire proceedings, it appears that veniremember T.H. could be fair and impartial and that she was not biased against the appellant. Therefore, the trial court did not abuse its discretion in refusing to remove her for cause.
With regard to veniremember K.S., the appellant asserts that she "stated that she had no respect for anyone who was a member of the KKK, that she was biased against the KKK and that mere membership in the KKK would affect her decision." (Appellant's brief at p. 101.) During the voir dire proceedings, veniremember K.S. stated that she thought that the appellant deserved a fair trial; that she would certainly try to listen to the evidence, follow the trial court's instructions, base her decision on the evidence presented and the law, and give the appellant a fair trial; that she did not have an opinion about the appellant's guilt; and that the fact that the appellant may have been associated with the KKK did not have any bearing on whether he had committed the offense. Based on those responses, the trial court could have reasonably concluded that veniremember K.S. could set aside her personal feelings and try the case fairly and impartially based on the law and the evidence. Therefore, it did not abuse its discretion in refusing to remove her for cause.
For these reasons, the trial court properly denied the appellant's challenges for cause.
Moreover, the record indicates that J.J., T.H., and K.S. did not serve on the jury. Further, the appellant has not made any showing that the jury that tried him was not fair and impartial. Therefore, error, if any, in the trial court's denial of the appellant's challenges for cause was harmless. See Evans v. State, 794 So.2d 411 (Ala.2000).
For the above-stated reasons, we affirm the trial court's judgment.
AFFIRMED.
McMILLAN, P.J., and SHAW and WISE, JJ., concur.
COBB, J., concurs specially, with opinion.
COBB, Judge, concurring specially.
I concur in the majority's thorough opinion in this difficult case. I am writing specially only to address the issue involving the trial court's denial of defense counsel's repeated requests for a continuance.
The trial in this case began on April 16, 2001, and trial counsel had been appointed to represent Blanton on February 9, 2001, only 66 days earlier. Trial counsel filed his first motion to continue on March 9, 2001, citing as grounds for the continuance that the case involved more than 8,000 documents and a multitude of witnesses, and that the State prosecutors had been preparing their case for four years. Counsel requested a 90-day continuance. Trial counsel filed his second motion to continue on April 12, 2001, citing as grounds that he *886 had recently received a binder containing updated transcripts of the wiretapped conversations and a videotape of an experiment conducted by the FBI involving exploding dynamite and the damage it caused to vehicles. Counsel asserted that he was seeking additional time to examine the new evidence and to locate potential witnesses, whose names he provided to the court. Counsel made a final motion to continue after voir dire proceedings were conducted. The trial court denied the three motions.
As the majority noted, decisions involving a request for a continuance are matters for the trial court's discretion.
"`The trial court has broad discretion in granting a continuance when the basis for the motion is that counsel has not had sufficient time to prepare or to develop his defense. A motion for a continuance due to a lack of time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a ... showing of abuse. Moreover, the reversal of a conviction because of the refusal of the trial judge to grant a continuance requires a positive demonstration of abuse of judicial discretion.'"
Hart v. State, 852 So.2d 839, 843 (Ala.Crim.App.2002)(quoting Loggins v. State, 771 So.2d 1070, 1084 (Ala.Crim.App.1999); internal quotation marks and citations omitted).
The better practice would have been for the trial court to have granted a short continuance so that trial counsel had additional time to prepare. However, in this case I agree that the denial of the motions for continuance did not constitute an abuse of the trial court's broad discretion. My review of the record supports the trial court's observation that defense counsel was clearly well prepared for trial and that he presented a thorough defense on behalf of his client. Moreover, Blanton has cited no instances of prejudice that resulted from the denial of a continuance.
Therefore, although granting the requested continuance would have avoided our having to consider this issue on appeal, I concur in the majority's determination that the denial of defense counsel's motions was not an abuse of the court's broad discretion.
NOTES
[1] Although the parties argued a different standard before the trial court, we will affirm a trial court's ruling admitting evidence if it is correct for any reason. See Guthrie v. State, 616 So.2d 914 (Ala.Crim.App.1993).
[2] In Desist v. United States, 394 U.S. 244, 246, 89 S.Ct. 1030, 1032, 22 L.Ed.2d 248 (1969), the Supreme Court noted:

"Last Term in Katz v. United States, 389 U.S. 347, [88 S.Ct. 507, 19 L.Ed.2d 576 (1967),] we held that the reach of the Fourth Amendment `cannot turn upon the presence or absence of a physical intrusion into any given enclosure.' Id., at 353[, 88 S.Ct. at 512]. Noting that the `Fourth Amendment protects people, not places,' id., at 351, [88 S.Ct. at 511,] we overruled cases holding that a search and seizure of speech requires some trespass or actual penetration of a particular enclosure.... We have concluded, however, that to the extent Katz departed from previous holdings of this Court, it should be given wholly prospective application."
Accordingly, the Court held "that Katz is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after December 18, 1967." 394 U.S. at 254, 89 S.Ct. at 1036.
[3] Because the parties agree that this is the law that applies, it is not necessary for this court to address all of the alternative arguments they make in their briefs to this court concerning the admissibility of the recording.
[4] Although the appellant challenged Lay's testimony in his motion for a new trial, that motion did not preserve his arguments for our review. See Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a motion for a new trial will not preserve an issue for appellate review).
[5] Although the appellant challenged Lay's testimony in his motion for a new trial, that motion did not preserve his arguments for our review. See Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a motion for a new trial will not preserve an issue for appellate review).
[6] Although he refers to the improper admission of Burns' testimony, the appellant does not include any argument as to this issue, as required by Rule 28(a)(10), Ala. R.App. P. Therefore, we will not address the admissibility of Burns' testimony.
[7] Although the transcript refers to veniremember J.S. Q# 92, the prosecutor was clearly referring to veniremember Y.S. Q# 60 and his answers during the voir dire proceedings. Therefore, the reference to J.S. Q# 92 appears to be a typographical mistake.
[8] The State also struck veniremember N.W. Q# 58. The State did not give its reasons for striking her, but the defense did not challenge the strike. During the voir dire proceedings, N.W. expressed concern about serving because she had a heart condition that could be triggered by stress. Subsequently, before the State could give its reasons for striking her, the trial court stated, "I've already gotten a message from her that she had to take some medication. She's deathly ill." (R. 804.)
[9] Although the appellant challenged the instruction in his motion for a new trial, that motion did not preserve his argument for our review. See Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a motion for a new trial will not preserve an issue for appellate review).
[10] Although he refers to the fact that the prosecution allegedly improperly showed the piece of mortar to the jury, the appellant does not include any argument as to this issue, as required by Rule 28(a)(10), Ala. R.App. P. Therefore, we will not address the propriety of the prosecution's action.
[11] At the time of McNair's testimony, the State had not introduced any evidence concerning the cause of the victims' deaths. Subsequently, the parties presented a stipulation about the cause of the victims' deaths.
[12] Although the appellant challenged Jackson's testimony in his motion for a new trial, that motion did not preserve his arguments for our review. See Hamrick v. State, 548 So.2d 652 (Ala.Crim.App.1989) (holding that, absent a timely and sufficient objection at trial, a motion for a new trial will not preserve an issue for appellate review).
[13] See Chambliss v. State, 373 So.2d 1185 (Ala.Crim.App.1979).